UNITED STATES of America,
Plaintiff-Appellee,

v.

Leo MIROFF and Jane Frances Powers,
Defendants-Appellants.

No. 78–2174.

United States Court of Appeals,
Seventh Circuit.

Argued May 24, 1979.

Decided Oct. 1, 1979.

Rehearing and Rehearing En Banc
Denied Dec. 5, 1979.

Jerome Rotenberg, Chicago, Ill., for defendants-appellants.

John T. Bannon, Jr., T. George Gilinsky, Washington, D. C., for plaintiff-appellee.

Before PECK, Senior Circuit Judge,* CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

In this appeal by Miroff from his conviction of conspiracy to transport stolen property in interstate commerce in violation of 18 U.S.C. § 371 and by Miroff and Powers of their conviction of transporting stolen property in interstate commerce in violation of 18 U.S.C. §§ 2314 and 2(b), the appellants raise five issues. We shall discuss the issues raised and the evidence pertinent thereto in the order presented in the appellants' brief.

I

WHETHER THE DISTRICT COURT ERRED IN DENYING THE DEFENDANTS' MOTION TO SUPPRESS EVIDENCE.

On January 11, 1973, furs, jewelry, and cash worth approximately $25,000 were stolen from a home in Indianapolis and shortly thereafter were divided in Illinois among various individuals including Miroff and Powers. Substantial evidence in the record supported the participation of both defendants in the entire operation including the transportation across the state line. On January 19, 1973, Miroff and Powers offered to sell Agent Tucci certain stolen radios which were not a part of the loot of the Indianapolis robbery. On January 26, 1973, federal agents and local police officers went to the residence of one Robert Harder and his wife with arrest warrants for Harder, Miroff, and Powers. At the time, Miroff and Powers were guests in the Harder home temporarily occupying the downstairs bedroom. The Harders kept personal and family belongings in closets and drawers in the downstairs bedroom including clothing, pictures, and papers. The bedroom door had no lock on it and appellants had no key to the house. A week or so prior to the service of the arrest warrants the police had come to the Harder house and the defendants had left the house with the police.

The defendants returned to the house whereupon, because of Mrs. Harder being nervous about having two children in the house, her husband told the defendants that they did not want anything in the house that did not belong there and specifically they did not want anything that was stolen. The defendants decided to stay on in the house instead of getting a motel room with the understanding there was nothing in the room that should not have been there. On the evening of the 26th, when Mrs. Harder came upstairs she looked out the window and saw a police car. She came downstairs and reported this to her husband who was with Miroff. She expressed the hope that there was nothing in the house, and that she did not want any more problems. Miroff replied that there was nothing in the house that should not be there.

On the arrival of the officers at the house on the evening of the 26th, Harder admitted the officers and gave permission for the officers to search the bedroom which had been occupied by the defendants. At one point in the testimony at the suppression hearing, one of the officers stated that Harder had told the officers that "that whatever was in the bedroom belonged to Mr. Miroff." This was not in fact the case, as indicated hereinbefore, although it does appear that all of the possessions of the defendants were in fact in the one bedroom. The officers searched the room and found and seized shopping bags containing radios and electric shavers, a garment bag containing jewelry, approximately $1000 in $20 bills, two guns, and plastic garbage bags containing furs. They also found two Indiana license plates on the floor of the closet. Finally, on the nightstand adjacent to the bed the officers found an address book and some papers listing each item of jewelry found in the garment bag with dollar amounts next to each item. The district court refused to suppress the various items seized during the search.

■ We have little trouble with the present issue insofar as the consent to

---

* Judge John W. Peck, Senior Circuit Judge for the Sixth Circuit, is sitting by designation.

search the room was concerned. Permission to search was obtained from a third party who possessed at the very least common authority over the bedroom sought to be inspected. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The defendants argue, however, that this consent, even though phrased as "full permission to search his residence" gave Harder no authority to consent to a search of the personal belongings of the defendants. Under the particular facts of this case, however, because the defendants had assured the Harders there was nothing stolen in the room and nothing there that did not belong there, the defendants must be regarded as having assumed the risk that one with whom they shared the common area might properly permit that common area to be searched, particularly when the sharer was the dominant or controlling party in the general premises. *See United States v. Cook*, 530 F.2d 145 (7th Cir. 1976), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835. The present case is stronger for the assumption of the risk than was *Cook* in view of the understanding that the defendants had with the Harders that there was nothing improper in the room. In effect, their staying on at the Harder house was on the express condition that they had nothing of a stolen nature in the room that they were occupying as guests. As the Supreme Court indicated in *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the courts should not engage in metaphysical subtleties with regard to such a consent. We think that language is applicable here where it could be fairly said that the defendants had knowingly and deliberately assumed the risk that Harder would allow someone else to look at all of the property in the room.

In their reply brief, the defendants rely strongly on *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) and *United States v. Isom*, 588 F.2d 858, 861 (2d Cir. 1978). We note, however, that in both cases the court emphasized the importance of the justifiable expectation of privacy. In the present case, the defendants by their assurances to Harder there were no stolen goods in the bedroom and that there was nothing there which should not have been there, placed Harder in a position of granting consent to a search of the entire room and its contents without any basis for his thinking that the defendants were asserting an expectation of privacy.

■ The defendants also argue that the seizure of these items was unreasonable as being made without probable cause because the arrest warrants were to be served in connection with the possession of stolen radios and at the time the officers were given permission to search the house they were not aware that the furs, jewelry, and cash they subsequently found were stolen. Because we regard probable cause as being determined by everyday factual and practical considerations on which reasonable and prudent men act, *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), once the officers found the radios and electric shavers in the shopping bags, jewelry, almost $1000 in $20 bills and two guns in a garment bag, furs with someone else's name sewed inside them in plastic garbage bags, and the handwritten list of jewelry, the officers had adequate probable cause to seize the items found in the bedrooms even though they did not know at the time that the items were stolen. We do not find any support for the appellants' position on the facts of this particular case in *United States v. Wilson*, 536 F.2d 883 (9th Cir. 1976), *cert. denied*, 429 U.S. 982, 97 S.Ct. 497, 50 L.Ed.2d 592, or *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966).

We are satisfied that the evidence seized bore a reasonable relation to the purpose of the search which was conducted in connection with an ongoing investigation of criminal dealing in stolen articles.

In sum, the situation in this case is not, in our opinion, the type to require us to invoke the exclusionary rule.

## II

WHETHER THE COURT ERRED IN PERMITTING EVIDENCE RELATING TO CRIMINAL ACTIVITY NOT CHARGED IN THE INDICTMENT.

Testimony was received in the trial, over objection, regarding the prior conversations with Agent Tucci about stolen radios and with regard to the officers going to the Harder residence to make arrests in connection with those radios. This evidence was received for the limited purpose of the jury determining what bearing, if any, it had on the knowledge and the intent of the defendants insofar as the items taken from the Indianapolis house were concerned.

The defendants concede that it is proper to establish criminal intent or knowledge by evidence of other criminal activity, but relying upon *United States v. Miller,* 508 F.2d 444 (7th Cir. 1974), they assert that this criminal activity was inadmissible to establish criminal intent or knowledge unless and until the defendants had affirmatively contested their intent and knowledge that the articles which were the subject of the indictment were stolen.

In the present case it seems clear to us as a preliminary matter that the evidence in question was similar to the offense charged and was close enough in time to be relevant. *United States v. Fierson,* 419 F.2d 1020, 1022–23 (7th Cir. 1969). While it is true that the instant indictment charged violations concerning transporting stolen property in interstate commerce and that the radio matter presumably more directly concerned the violation of the theft statutes of Illinois, both situations involved the handling and disposition of stolen property, one element only of the federal case being the matter of the transportation across state lines.

The appellants argue, however, that something more is required than similarity and time-proximity and that *Fierson* holds that such evidence should not be admitted when the accused has not put wilfulness or intent in issue. They argue that the element of intent, or knowledge, was merely a formal issue in their trial. This court in the later case of *United States v. Weidman,* 572 F.2d 1199, 1202 (7th Cir. 1978), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113, was confronted with a similar argument under *Fierson,* the appellant there empha-

sizing that his defense was not based on a claim of accident or mistake but on the broad denial that he had committed the charged acts. He insisted, therefore, that there was in fact no contest as to his state of mind. The court rejected this contention, pointing out that the Government had a substantial need to evidence Weidman's intent even though he had not "sharpened" the issue by claiming accident or mistake. There the Government had the burden of proving beyond a reasonable doubt the element of specific intent to defraud. In the case before us the Government has a burden of proving beyond a reasonable doubt the essential element in the crime of transporting stolen property in interstate commerce (18 U.S.C. § 2314) of knowledge on the part of the defendant that the property was stolen. Under Rule 404(b), Federal Rules of Evidence, evidence of other crimes, wrongs, or acts are specifically admissible for the proof of knowledge.

■ We cannot say that evidence such as that challenged here which appears to us to have a direct bearing on the knowledge of the defendants in dealing with stolen goods should have been excluded from evidence. *See United States v. Parnell,* 581 F.2d 1374, 1384 (10th Cir. 1978), cert. denied, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44. We recognize that on this point this is a close case and that the Government did offer substantial evidence, both direct and circumstantial, from which knowledge might be inferred. Nevertheless, evidence of specific knowledge in the transactional processing of stolen goods does appear to have direct bearing upon the crime charged and therefore, in the discretion of the trial court, was properly admitted.

III

WHETHER THE COURT ERRED IN ADMITTING TESTIMONY RELATING TO GUNS FOUND IN THE BEDROOM.

■ During the course of the direct testimony of one of the officers he was asked what had been seized in the bedroom. In response to a continuing line of similar

questions he set forth the various items. He was asked if he had found anything else, to which he replied, "yes," and when he was asked what that was he answered that he had found two guns. At this point defense counsel simply stated, "Objection," but did not move to strike the evidence. The court overruled the objection. The witness then concluded his testimony, reciting that there had been currency and jewelry and some papers seized. At the conclusion of the day's evidence the defense moved for a mistrial on the basis of the guns and certain other matters. During the colloquy concerning this motion it appeared that defense counsel through discovery had been advised of everything that had been found in the bedroom including the two guns and had also been advised through discovery that there was no indication as to the ownership of the guns and that they were not the same make or identity as the two guns about which the witness Almeida had testified.[1] We agree with the Government that the defense objection and motion for mistrial were on the belated side. A motion could have been filed under the circumstance of this case in advance of trial if counsel felt that the disclosure of the presence of the guns would be as prejudicial as it is now claimed it was. The court denied the motion for mistrial and pointed out that the defendants had been charged in the conspiracy count with conspiring to commit a robbery and induce fear in and commit violence upon their intended victims by the use of firearms. The court thought that the possession of the handguns was a circumstance which was consistent with that kind of activity and he pointed out that while the possession did not prove the point it was a relevant circumstance that the jury was entitled to consider along with all other evidence.

We are not unmindful of cases where there was no relevance to the showing of the possession of a gun or where the likelihood existed that the prejudice outweighed the relevancy, where it was held the admission of the evidence was erroneous. *Moody v. United States,* 376 F.2d 525 (9th Cir. 1967); *United States v. Warledo,* 557 F.2d 721 (10th Cir. 1977).

On the other hand, other cases have held that there was sufficient relevance for the testimony to be admitted. *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *United States v. Stone,* 471 F.2d 170 (7th Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973); *United States v. Wiener,* 534 F.2d 15 (2d Cir. 1976), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80.

While we do not feel that we are in a position to observe as the Second Circuit did in *Wiener* with regard to narcotics dealers that possessors of stolen goods transported in interstate commerce keep firearms on their premises as tools of the trade, *id.* at 18, we nevertheless find, particularly in view of the charge in Count I of the indictment, that there was relevance. Further we do not from the record in this case regard the incidental testimony as to the guns as creating such prejudice as to require reversal.

■ We also are mindful as being applicable both to the present point and some other matters subsequently discussed that a trial judge is afforded broad discretion in determining whether the probative value of the evidence being offered is outweighed by the possible prejudice of the evidence. *United States v. Juarez,* 561 F.2d 65 (7th Cir. 1977); *United States v. Krohn,* 560 F.2d 293 (7th Cir. 1977), *cert. denied,* 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182.

IV

WHETHER THE COURT ERRED IN DENYING OTHER DEFENSE MOTIONS FOR A MISTRIAL.

On several occasions during the course of the trial, Government witnesses testified to matters which were stricken by the court

---

1. Almeida was an unindicted co-conspirator, a principal participant in the Indianapolis robbery, and a principal Government witness.

on motion of the defense. The defendants contend, however, that these instances, either singularly or cumulatively, created sufficient prejudice that the mere sustaining of the objection and striking of the answer was not sufficient to wipe out the harmful effects of the improper testimony and that a mistrial should have been granted.

■ We are not unmindful of the frequency with which the strong words of Mr. Justice Jackson in *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949) are quoted to the effect that all practicing lawyers know it to be an unmitigated fiction that prejudicial effects can be overcome by instructions to the jury. While from our own experience in the practice of law and from observing records of trials we might feel that this characterization is on the overly-strong side and scarcely gives full credit to the fact that many, if not most, jurors conscientiously attempt to follow the court's instructions, we will nevertheless look at the instances in question here to determine whether they are of a sufficient prejudice potential to require reversal. We do not so regard them.

Two of the incidents involved the witness Almeida. On one occasion he testified that the unindicted co-conspirator Foresta knew Miroff and in a conversation with Foresta the witness was told that Miroff used to give him tips on scores to make and on another occasion Miroff had spoken with the witness and Almeida was told that he could feel free to talk in front of Powers "that she was a stand-up broad and that she shot her husband, something like that." The third incident involved a Chicago detective who in setting forth his duties assigned to his division stated that his responsibility was "with known thieves, professional thieves." The trial judge here each time took prompt and decisive action to negate potential prejudice. *United States v. Harris,* 558 F.2d 366 (7th Cir. 1977); *United States v. Zarattini,* 552 F.2d 753 (7th Cir.

1977), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262; *United States v. Lawson,* 507 F.2d 433 (7th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762.

From our examination of the record, we find ourselves unpersuaded that an unfair trial resulted from these three instances in testimony contained in a transcript of more than 350 pages, recognizing that "instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). We have no reason for thinking from this record that the Government deliberately sought these remarks [2] as a part of their case which was a strong case of guilt without the items in question. While their uttering before the jury may have prevented this from being a perfect trial, a perfect trial is not required but only a fair trial and in view of the prompt and decisive action of the district court we do not believe that the defendants were denied a fair trial.

We also note, in addition to the action taken by the judge at the time the instances came into the trial, that early in its charge the court advised the jury that it had been the court's duty to rule on the inadmissibility of the evidence and the jury should not be concerned with the reason for this rule and that it "should disregard . . testimony which the Court has refused or stricken, and you should also disregard any remarks or comments which the Court struck." Finally as some indication that the testimonial remarks were not of the overpowering prejudice ascribed to them by the defendants, we note that Powers was acquitted on the conspiracy count.

## V

### WHETHER THE COURT ERRED IN PERMITTING THE PROSECUTION TO PROVE ALL OF THE DETAILS OF THE HOME INVASION.

---

2. We note that the Government attorney advised the court early in the trial with regard to Almeida that he had spoken to Almeida with a deputy marshall present and advised him that he should be very careful and refrain from answering questions that would involve information concerning Miss Powers and her husband about marijuana.

The defendants concede that some of the evidence as to the circumstances of the robbery in the Indianapolis home might have been necessary in the Government's case to establish the fact that the jewelry, cash, and furs were stolen, "it should have been done in a manner that was not so prejudicial to the defendants." This complaint in essence is that there was no necessity "of going through all of the minute details of circumstances surrounding the robbery." We again initially note the part of the indictment under the conspiracy count referring to the robbery by means of deceit and misrepresentation and that the conspirators would induce fear in and commit violence upon their intended victims by the use of firearms. Nevertheless, the court during the opening statement of the Government to the jury instructed the jury that if there was any evidence about what any of the defendants did at the Indianapolis home it would be admitted solely on the question of their knowledge as to the status of the property as to whether it was stolen or was not. The court also stated that it wanted it made very clear that this was not a robbery case, it was not a burglary case, but it was a case involving the alleged interstate transportation of stolen property.

The defendants particularly point out the details contained in the testimony of Almeida and the maid at the Indianapolis residence. With regard to Almeida he, of course, was a participant who became one of the principal Government witnesses with regard to the details of the crime which put the property in question into the status of stolen property. The Government by going into detail on his testimony plainly demonstrated that he was giving testimony as a person who himself had participated in the crime of violence and the testimony therefore would seem to be within the realm of admissible evidence in the court's discretion, to show that Almeida was intimately knowledgeable about the details leading up to the property reaching the status of being stolen before it was transported in interstate commerce. In any event, the defendants have directed the court's attention to eleven pages of the transcript with regard to Almeida. At page 45, defense objected on the ground of immaterial hearsay upon which the court admonished the Government counsel that not every last detail of the entry need be gone into, that the tail should not wag the dog, that they were entitled to prove it was stolen property but they should not try a robbery case. The Government stated it was simply talking about the entry into the house. The next objection appeared at page 52 on the ground of immateriality as to a conversation which the court overruled. At page 54, there was one further and final objection appearing in this segment of the transcript, again on the grounds of immateriality, in which the witness Almeida was describing the guns that were used. From our reading of this portion of the transcript we do not regard the testimony as that which would arouse prejudice on the part of the hearer.

With regard to the maid's testimony, the Government asserts that because of the defense attempt to discredit the testimony of the key witness Almeida, the Government in response put on Mrs. Burgin, the maid, to corroborate essential parts of his testimony. Under the circumstances of corroborating the testimony, we do not regard it as so prejudicial as to outweigh its probative value. *United States v. Chapin,* 169 U.S.App. D.C. 303, 515 F.2d 1274 (D.C. Cir. 1975), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387.

In the some 17 or 18 pages of the Burgin testimony to which the defense directs us, while we have spoken of violence, the testimony basically deals with the description of the premises and the incident of deception whereby Foresta and Almeida gained entry into the house and the fact they did tie her up, none of which is of the prejudicial nature which was involved in *United States v. Ostrowsky,* 501 F.2d 318 (7th Cir. 1974) in which this court held that the trial court had abused its discretion by permitting proof of the gruesome and unnecessary details of the victim's murder.

In sum, we think that the district court judge conducted a fair trial, and that the

judgments of conviction should be affirmed for the reasons set out in this order.

Affirmed.