633 P.2d 366

**STATE of Arizona, Appellee,**

v.

**Edward Harold SCHAD, Jr., Appellant.**

No. 4876.

Supreme Court of Arizona,
En Banc.

July 13, 1981.
Rehearing Denied Sept. 10, 1981.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and David R. Cole, Asst. Attys. Gen., Phoenix, for appellee.

Charles Anthony Shaw, Prescott, for appellant.

HAYS, Justice.

The appellant, Edward Harold Schad, Jr. (hereinafter defendant), was convicted by a Yavapai County jury of first degree murder and was sentenced to death. Defendant now appeals both the conviction and the sentence. We have jurisdiction pursuant to A.R.S. § 13–4031. Judgment of conviction and sentence affirmed.

The facts of this case are rather complicated. Accordingly, general facts surrounding the crime will be provided here and other facts which are necessary for resolution of the issues raised by defendant will be developed within the opinion.

On August 9, 1978, a badly decomposed body of an elderly male was found approximately nine miles south of Prescott, Arizona, adjacent to a roadway pull-off on U.S. Highway 89. The body was discovered after a highway department worker had detected the odor of decaying human flesh the previous day while driving past the pull-off. Although the worker and his coworker had stopped briefly to investigate the odor on August 8, the body was not actually discovered until the next day due to the fact that it was well concealed in the brush. After the corpse was discovered, the Yavapai County Sheriff's Department and the County Medical Examiner observed a small rope tied around the victim's neck. It was later established that the cause of death was strangulation.

Because of the advanced state of decomposition, the body was not identified until October 11, 1978, when it was established that the deceased was Lorimer "Leroy" Grove, a 74-year-old Bisbee resident. Grove had last been seen on August 1, 1978, in Bisbee, Arizona. On that morning, Grove left Bisbee driving a new Cadillac, pulling a camper-trailer. His ultimate destination was Everett, Washington, where he had intended to visit his sister.

On August 3, 1978, a dark green Ford Fairmont was found abandoned 30 miles north of Flagstaff, Arizona, alongside U.S. Highway 89 by a Department of Public Safety Highway Patrolman. It was subsequently determined that the Fairmont had been rented by the defendant from a Ford dealership in Sandy, Utah, on December 31, 1977. Although the vehicle had been rented for the weekend, it was never returned and had been reported as stolen. The vehicle was turned over to the Coconio County Sheriff's Department and was impounded at a local towing yard. On September 12, 1978, two officers examined the vehicle in connection with an investigation of possible homicide charges against defendant. Several items belonging to the victim were found in the Fairmont, including a mirror device which was identified as being similar to one used by the deceased to hook the trailer to the automobile by himself.

On September 3, 1978, defendant was stopped by a New York Highway Trooper, for speeding, while driving the victim's Cadillac. When the defendant could not produce a registration on the vehicle, the officer asked for an explanation. Defendant replied that it wasn't his car but that he was delivering it for a friend to an area five or ten miles from where the officer stopped him. Asked who was the friend was, defendant said he was an elderly gentleman by the name of Larry Grove.

Defendant was arrested in Salt Lake City, Utah, on September 8, 1978, for parole violation. Defendant had been on parole from the Utah State Penitentiary where he

had been serving a sentence for second degree murder conviction. After defendant was arrested and taken into custody, the Cadillac was taken to the Salt Lake City Police Department impound lot where it was searched. Various personal items were found in the car which were identified as belonging to the victim.

Defendant raises the following arguments for our consideration:

1. The warrantless search of the Cadillac and defendant's wallet violated defendant's fourth amendment rights;

2. An informant's testimony regarding statements made by defendant while in jail violated defendant's sixth amendment rights;

3. Statements made to various police officers were involuntary;

4. The trial court improperly restricted voir dire questioning of the jury;

5. The jury should have been sequestered;

6. Defendant was denied his right of confrontation under the sixth amendment when the trial court admitted into evidence portions of the suppression hearing transcript concerning written and oral statements of the defendant;

7. Defendant's prior prison record should have been admitted;

8. The State deprived defendant of a fair trial by failing to make a good-faith effort to obtain fingerprints of the "French people";

9. The trial court abused its discretion in admitting a photograph of the deceased;

10. The evidence was insufficient to support the conviction;

11. The trial court improperly instructed the jury;

12. The death penalty was not properly imposed;

13. A.R.S. § 13–454 is unconstitutional in this case.

## SEARCH OF CADILLAC AND WALLET

Defendant's first point deals with the trial court's refusal to suppress evidence seized from the warrantless searches of defendant's wallet and the Cadillac. We turn first to the evidence obtained from defendant's wallet.

At the time of arrest, defendant was immediately taken into custody and transported to jail. Wilma Horrocks, who was present at the scene of arrest and had been cohabiting with defendant during the preceding year, was asked by defendant to pick up his personal belongings from the jail. Among these items was defendant's wallet which contained two VISA credit cards belong to the murder victim. At the jail, the police inexplicably released the wallet to Horrocks without examining the contents. On the following day, after being informed that the wallet contained stolen credit cards, Detective John Johnson of the Salt Lake City Police Department went to Horrocks' residence in order to try to obtain the credit cards. Once there, Johnson asked Horrocks if she had two stolen credit cards; she answered that she did, retrieved the wallet and gave the cards to Johnson. No warrant was obtained to seize the cards.

Defendant maintains that because the wallet was released to his girlfriend at her request and upon his instructions, defendant had a legitimate expectation of privacy in its contents. Therefore, defendant argues he has standing to object to the "unlawful" search of his wallet without a warrant even though it was in the custody of his girlfriend.

■ It is undisputed that searches and seizures that may be made at the time of arrest may be legally conducted later when the accused arrives at the place of detention. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). Thus, at the time defendant was taken into custody, the police would have been acting well within their permissible authority under the fourth and fourteenth amendments had they conducted a search of the wallet at the jail. Admittedly, in this case the police neglected to do this and instead

turned the wallet and its contends over to Horrocks. We need not decide whether this gave rise to a legitimate expectation of privacy in the contents of the wallet, however, since Horrocks consented to the search and voluntarily turned over the credit cards to Detective Johnson.

■ It is well settled that a warrantless search of property is valid if conducted pursuant to a voluntary consent. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *State v. Tucker*, 118 Ariz. 76, 78, 574 P.2d 1295, 1297 (1978), *cert. denied*, 439 U.S. 846, 99 S.Ct. 144, 58 L.Ed.2d 147 (1978). "A consent to search may be evidenced by conduct as well as by words. However, the constitutional protection against unreasonable searches demands a waiver by unequivocal words or conduct expressing consent." *State v. Tucker, supra*, 118 Ariz. at 78–79, 574 P.2d at 1297–98. These same principles apply where the consent is given by one who possesses common authority over the premises or effects. In such a situation, the consent is valid as against the absent, nonconsenting person with whom that authority is shared. *United States v. Matlock, supra*, 415 U.S. at 171, 94 S.Ct. at 993.

■ In the present case it is clear that Horrocks had the authority to consent to the search of the wallet and seizure of the credit cards. The wallet was released to her at defendant's request. By allowing her to take possession and control of the wallet, defendant "assumed the risk" that she would allow someone else to have the contents, here the stolen credit cards. *United States v. Matlock, supra; United States v. Miroff*, 606 F.2d 777, 779 (7th Cir. 1979).

■ We also find the consent to the search to have been voluntarily given. There were no overt acts or threats of force by Detective Johnson nor were there any indications of more subtle forms of coercion. Detective Johnson testified that he had no intention to search for the cards, and, if Horrocks had refused to give them to him, he would have left the premises.

Horrocks' testimony does not dispute this. The conclusion that her consent was voluntary is also bolstered by the fact that she brought the wallet to the police station a week later and turned it over to Detective Johnson.

Defendant also argues that since he had been driving the Cadillac for the previous six weeks, he had standing to assert a legitimate expectation of privacy regarding the seized contents of the Cadillac. In support of this contention, defendant relies heavily on *Cotton v. United States*, 371 F.2d 385 (9th Cir. 1967), which held that a thief who had possession of a stolen automobile and claimed it as his own had standing to object to a search of the car.

We do not find *Cotton* to be persuasive in light of *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), where the Supreme Court held that the defendants did not have standing to challenge a search of the automobile in which they were riding as passengers. In so holding, the Court noted that a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. 439 U.S. at 143 n.12, 99 S.Ct. at 430–31. We find especially significant the fact that the Court in *Rakas* expressed its disapproval of the result in *Cotton*. After emphasizing that the Court in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), was careful to note that "wrongful" presence at the scene of a search would not enable a defendant to object to the legality of the search, the Court went on to observe that "[d]espite this clear statement in *Jones*, several lower courts inexplicably have held that a person present in a stolen automobile at the time of a search may object to the lawfulness of the search of the automobile. *See, e. g., Cotton v. United States* (citation omitted) . . ." 439 U.S. at 141 n.9, 99 S.Ct. at 429.

Similarly, this court has refused to recognize as "reasonable" any expectation of privacy a thief may have in an automobile which he has stolen. *State v. Myers*, 117 Ariz. 79, 570 P.2d 1252 (1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524

(1978). Defendant attempts to distinguish *Myers* by pointing to the fact that the stolen automobile in that case had been abandoned. Further, defendant asserts that because there were numerous items of his own property located in the Cadillac he had an expectation of privacy in the automobile.

We do not view *Myers* so narrowly. We cannot see how lack of abandonment of a stolen vehicle, coupled with the fact that the thief may have some of his own property in the automobile, can elevate defendant's standing to object to a warrantless search. The capacity to claim the protection of the fourth amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place. *Rakas v. Illinois, supra*, 439 U.S. at 143, 99 S.Ct. at 430; *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). Clearly, defendant's expectation is not one that society is prepared to recognize as reasonable, nor are we. *See also Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (defendant not entitled to challenge search of woman's purse merely because he claimed ownership of drugs in the purse). The items taken from the Cadillac were properly admitted into evidence.

INFORMANT'S TESTIMONY IN RE STATEMENTS MADE BY DEFENDANT WHILE IN JAIL

The Salt Lake City Police learned of defendant's presence in Salt Lake City from information supplied by John Duncan. Duncan had been arrested by Detective Halterman of the Salt Lake City Police Department on a California fugitive warrant but had fought extradition and was eventually released by the Utah authorities. Afterwards, Duncan and his wife were living with Wilma Horrocks when defendant arrived in town driving the victim's Cadillac.

Defendant told Duncan that he was a parole violator and wanted to know the fastest way out of town after his visit with Horrocks. Duncan then informed Detective Halterman of defendant's presence. Halterman checked Duncan's information and discovered that defendant was indeed a parole violator. Duncan told Halterman where defendant had parked the Cadillac, and Halterman arranged for defendant's arrest the next morning. After defendant was arrested as he was attempting to leave town, Duncan contacted Halterman several more times. On these occasions, Duncan told Halterman about the stolen credit cards in defendant's wallet and about some credit card receipts Duncan had recovered. He later turned these receipts over to Halterman. These contacts were all initiated by Duncan. The police did not direct Duncan's activities nor did they pay Duncan for the information.

Several days later, Duncan volunteered to visit defendant in jail and offered to report the conversation to the police. After this was considered by the police and prosecutorial officials, however, the idea was rejected. Detective Halterman summarized this decision at the suppression hearing:

"Q. Was there ever any discussion with [Duncan] as to his talking to Ed Schad and relaying any information that he might learn from him to you or any other officer?

"A. There was—that point was brought up at one time I believe, by Mr. Duncan and I with my captain and also the County Attorney concerning that and determined that that would not be a good idea, and that was discussed and that information was relayed to Mr. Duncan.

"Q. What was Mr. Duncan's reaction, if any?

"A. That he still was an acquaintance of Mr. Schad and that he would—if he wanted to visit him he could visit him, I mean, we didn't have the right to tell him he couldn't but that was about it.

"Q. Then do you know whether he did visit him or not?

"A. I believe he did.

"Q. Did Mr. Duncan ever talk to you or tell you what came about from such a visit, if anything?

"A. It seems like he told me that he talked to him and told Mr. Schad that the Police Department had the credit cards at that time, and I believe he asked Mr. Schad where the trailer was and Mr. Schad would not tell him.

"Q. That is all the information that you learned from Mr. Duncan in regard to that visit?

"A. Yes."

Although Duncan wanted "some help from the police" with regard to his California parole violation, this help did not amount to more than a promise from Detective Halterman that he would write a letter to Duncan's judge in California relating Duncan's assistance in the investigation. At the time of trial, Duncan was still serving a sentence in Chino State Prison, California.

Based upon the foregoing, defendant contends that Duncan was acting as an agent for the State and was soliciting information by trickery, in violation of defendant's sixth amendment right to counsel. In advancing this position, defendant argues that *State v. Smith*, 107 Ariz. 100, 482 P.2d 863 (1971), controls the facts of the present case. We cannot agree.

In *State v. Smith, supra*, this court was presented with facts which indicated an agency relationship existed between an informant and the Maricopa County Attorney's Office. The court summarized the facts leading to this conclusion as follows:

"Mahan was a known informer used by the County Attorney on a previous occasion, with the express understanding that in exchange for testimony, parole for Mahan would be obtained; out of 350–400 inmates in the Maricopa County Jail, the defendant was placed next to this known informer; the County Attorney's office had the power to control the placement of inmates; following the performance by Mahan of all the services required of him in connection with his prior activities, he was allowed to remain in the Maricopa County Jail for six months; the notes delivered to the County Attorney's office were specifically marked in such a manner as would require Mahan's testimony at defendant's trial; and notes were made by [the County Attorney] of defendant's oral conversations with Mahan, again indicating the necessity of Mahan's appearance at trial." 107 Ariz. at 103, 482 P.2d at 866.

Additionally, after obtaining the evidence from Mahan concerning the defendant, Mahan's robbery conviction was reduced to grand theft and he was resentenced to time served and released. "In other words Mahan received his quid pro quo." *Id.* at 104, 482 P.2d at 867. Under these circumstances, this court held that the notes obtained by the informant from the defendant were inadmissible under the doctrine of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[1]

Turning to the facts of the present case, we hold that there was no agency relationship between Duncan and the Utah authorities. There was obviously no "quid pro quo" for Duncan's assistance. Duncan initiated the contacts with the police and did so without any tangible promise of pecuniary gain or prospect of release from prison. Additionally, there were no concerted actions on the part of the police aimed at priming Duncan as a witness against defendant at trial, as evidence by the unwillingness of the authorities to deliberately

---

1. More recently, the United States Supreme Court in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), has identified three factors in determining whether a government agent is deliberately eliciting incriminating statements from the accused within the meaning of *Massiah*. First, the agent must be acting under instructions as a paid informant for the government; second, the informant is ostensibly no more than a fellow inmate of the accused; and third, the defendant is in custody and under indictment at the time he is engaged in conversation by the informant. 447 U.S. at 270, 100 S.Ct. at 2186. However, we do not believe that any of these factors are applicable to the present case.

elicit incriminating statements from defendant during the suggested jail visit.

As we pointed out in *Smith*,

"it should be emphasized that law enforcement officials have the right, and indeed the obligation in the prosecution of crimes to use all information that comes into their hands pointing to the guilt of the accused. This is true even though the persons supplying that information may harbor expressed or unexpressed motives of expectation of lenient treatment in exchange for such information. It is only when the state actively enters into the picture to obtain the desired information in contravention of constitutionally protected rights that the sanction of inadmissibility becomes pertinent." 107 Ariz. at 103, 482 P.2d at 866.

Regardless of Duncan's motivations in aiding the police, we cannot say that the police "actively entered into the picture" so as to give rise to an agency relationship. When viewed along with the fact that the information gained through the jail conversation was insignificant, it is apparent that the trial court did not err in denying defendant's motion to suppress the statements.

## VOLUNTARINESS OF STATEMENTS MADE TO POLICE OFFICERS

Defendant next argues that the trial court erred in admitting certain statements made to Salt Lake City, Utah, and Yavapai County law enforcement officers. Defendant does not contend that these statements were obtained in violation of his *Miranda*[2] rights but asserts the statements were involuntary under A.R.S. § 13–3988(B)(1) and (2).[3] Relying on the statute, defendant claims his statements were involuntary because 1) they were made during an unreasonable length of time between his arrest

for parole violation on September 8, 1978, and the arraignment on the murder charge on March 21, 1979, and 2) that because he was arrested on the parole violation charge, he did not know the nature of the offense for which he was charged nor of which he was suspected at the time of making the statements.

■ We have repeatedly stated that confessions are prima facie involuntary and the burden is on the State to show that they were freely and voluntarily made, and that they were not the product of physical or psychological coercion. *State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023 (1980); *State v. Hall*, 120 Ariz. 454, 586 P.2d 1266 (1978); *State v. Arnett*, 119 Ariz. 38, 579 P.2d 542 (1978). Although the statements at issue do not rise to the level of a confession, they served to destroy the defendant's credibility as a witness on his own behalf; therefore, if the statements were involuntary, their use against the defendant at trial would be a denial of due process. *See Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). Accordingly, the State must shoulder the same burden in showing that these statements were not the product of physical or psychological coercion.

■ As to defendant's first contention that his statements were involuntary because of the delay between the time of arrest and his first appearance before a magistrate, we have observed that "such a delay is but a factor to be considered and does not ipso facto render such statements involuntary." *State v. Arnett, supra*, 119 Ariz. at 44, 579 P.2d at 548. Here, defendant does not claim he was subjected to any such practices, but merely points to the time span and the fact that he was not transferred from the Salt Lake County Jail

2. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. A.R.S. § 13–3988(B)(1) and (2) provides:
"The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including but not limited to the following:

1. The time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment.
2. Whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession.

to the Utah State Penitentiary as would be the normal practice for a prisoner facing a parole revocation hearing. We do not see how this different procedure made defendant's statements involuntary and must uphold the trial court's determination on this point.

■ We also find defendant's second contention that he did not know the nature of the offense for which he was charged or suspected to be wholly unsupported by the record. On September 12, 1978, Officer Jones asked defendant a number of questions concerning the Cadillac and specifically asked defendant if he knew Larry Grove. On September 19, 1978, Jones told defendant that he thought defendant was involved in the death of Grove. This line of inquiry obviously put defendant on notice that he was a murder suspect, especially in light of the fact that defendant, a habitual criminal, was no stranger to the criminal justice system. The trial court was correct in denying defendant's motion to suppress the statements.

## REFUSAL TO USE DEFENDANT'S REQUESTED VOIR DIRE QUESTIONS

Defendant contends that the trial court erred in refusing to ask certain questions submitted by defendant during the voir dire examination. The submitted questions concerned:

1) whether any prospective juror had any conscientious or religious opinions concerning the death penalty;

2) whether the prospective jurors or family members had any knowledge of correctional institutions or parole;

3) whether the prospective juror would have convicted defendant because of his involvement in other crimes;

4) whether the prospective jurors or any family members were personal friends or acquaintances of any other persons serving on the jury panel; and

5) whether the prospective jurors had any disagreement with the law of murder or the law of the alibi defense.

■ In discussing procedures for selecting a jury in a criminal trial pursuant to 17 A.R.S. Rules of Criminal Procedure, rule 18.5, we have emphasized that the rule

"places the responsibility for conducting voir dire examination of the prospective jurors on the court ... The purpose behind the provisions of Rule 18.5 is to give the trial court authority to limit the scope of examination to those questions reasonably designed to expose possible prejudice on the part of the jurors."

*State v. Melendez,* 121 Ariz. 1, 3, 588 P.2d 294, 296 (1978). "While it is the court's duty to question potential jurors, the extent of *voir dire* examination to determine the presence or absence of prejudice is left to the sound discretion of the trial court." *State v. Smith,* 114 Ariz. 415, 418, 561 P.2d 739, 742 (1977). We have reviewed the voir dire examination conducted by the trial court and find that the court adequately questioned the prospective jurors so as to have enabled the parties to exercise intelligently their peremptory challenges and challenges for cause.

The trial court propounded questions which more than adequately dealt with the area of concern touched upon by defendant's capital punishment question. This is evidence by the fact that one prospective juror indicated that he had "a strong objection to capital punishment." After listening to the ensuing discussion which occurred between the court and the prospective juror, no other prospective jurors indicated they had any opinions which would prevent them from reaching a just verdict.

■ Similarly, defendant's second proposed question was properly refused. Defendant claims this question was necessary because defendant had a right to know if any prospective juror was an "expert" on the subject of prisons, correctional institutions and parole. The trial court refused this question in light of the fact that information relating to present or past occupations was elicited from the prospective jury members.

■ Defendant's third proposed question constitutes an attempt to "condition"

the jurors by forewarning them of unfavorable facts concerning defendant. We have disapproved of this practice in *Melendez, supra*, and find no error in the trial court's refusal to give this question.

 Finally, defendant argues that the fourth and fifth proposed questions were necessary in order to allow him to intelligently exercise his peremptory challenges. In both instances, defendant assumes this information would inform him whether a prospective juror would be more likely than other jurors to violate the court's admonitions and instructions. With respect to the fourth question, we find such an inference to be tenuous, at best. Furthermore, there is no presumption that jurors will disobey instructions given them by the court. *State v. Trujillo*, 120 Ariz. 527, 587 P.2d 246 (1978). It was not error to refuse to ask the requested questions.

## JURY SEQUESTRATION

Defendant argues that the trial court erred when it denied his motion to sequester the jury. Specifically, defendant points to the fact that there were various newspaper articles published concerning the case which mentioned defendant's prior conviction for second degree murder.

While conducting the voir dire, the trial court carefully inquired whether any prospective juror had been exposed to any media coverage concerning the case. This inquiry led to the disqualification of one prospective juror. Immediately after the jury was selected and during the course of the trial, the court repeatedly admonished the jurors not to read or listen to any accounts that may appear in the media.

 The decision to sequester the jury is within the discretion of the trial

court and as such will not be disturbed on appeal absent a clear showing of abuse of discretion and resulting prejudice to defendant. *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981). In claiming that the trial court erred in refusing to sequester the jury, the burden of proving that publicity actually prejudiced the jury is on the defendant. *See State v. Lippard*, 26 Ariz. App. 417, 549 P.2d 197 (1976). This the defendant has not done. Accordingly, we will not disturb the trial court's discretion in this matter on appeal. *State v. Greenawalt, supra*, 128 Ariz. at 162, 624 P.2d at 840.

## RIGHT OF CONFRONTATION AND CROSS–EXAMINATION

Defendant next claims he was denied his sixth amendment right to confront witnesses against him and was denied sufficient opportunity to cross-examine when the trial court admitted into evidence portions of a suppression hearing transcript of Kent Jones, a Utah probation officer, concerning the voluntariness of statements made to Jones.

Defendant attacks the admissibility of the suppression hearing transcript under 17A A.R.S. Rules of Evidence, rule 804(b)(1),[4] by asserting that there was not a similar motive to develop Jones' suppression hearing testimony, where voluntariness was at issue, as was present at trial, where guilt was at issue. Defendant maintains he desired to elicit testimony to the effect that defendant was regarded as a "snitch" at the Utah State Penitentiary. According to defendant, this testimony would have directly related to the issue of guilt since it reflected favorably upon the credibility of the defendant.[5] Defendant also argues that

---

4. Rule 804(b)(1) provides:
 (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 (1) *Former testimony.* Testimony given as a witness at another hearing of the same or different proceeding, or in deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predeces-

sor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

5. Defendant relied on his fear of being labelled a "snitch" in order to explain why he gave numerous fabricated accounts as to how he came into possession of the Cadillac, which differed from defendant's testimony at trial, where he implicated an escaped Utah convict.

this questioning would not have been relevant to determine whether defendant's statements to Jones were made voluntarily at the suppression hearing. We believe, however, that this line of questioning was relevant to the voluntariness hearing and was germane to the issue of whether statements to Jones were made freely in the first place. We note further that defendant did not even attempt to go into this area on cross-examination, nor did he attempt to subpoena Jones in his own defense.

It is well within the trial court's discretion to decide if defense counsel had sufficient opportunity to cross-examine the witness at the prior proceeding. *State v. Ray*, 123 Ariz. 171, 598 P.2d 990 (1979). Absent an abuse of discretion, this judgment will not be disturbed on appeal. Because we are of the opinion that defendant had the opportunity and similar motive to develop Jones' testimony at the suppression hearing as he would have had at trial, we find the transcript testimony to have been properly admitted under the hearsay exception of rule 804(b)(1).

In raising the sixth amendment claim, defendant argues that the testimony should not have been admitted because he did not have a full and meaningful opportunity to cross-examine Jones on the issue of guilt. The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This sixth amendment right is a fundamental right made applicable to the states by the fourteenth amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). A critical inquiry which arises under the sixth amendment is whether the administration of hearsay testimony by way of exception violates the command of the Confrontation Clause. Because the Confrontation Clause reflects a preference for face-to-face confrontation at trial and a primary interest secured by the clause is the right of cross-examination, *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531,

2537, 65 L.Ed.2d 597 (1980); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965), the clause operates to restrict the range of admissible hearsay in two ways. First, the prosecution must demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant; second, once the witness is shown to be unavailable, his prior testimony must bear some "indicia of reliability." *Ohio v. Roberts, supra*, 448 U.S. at 66, 100 S.Ct. at 2538-39; *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972). Once the unavailability of the declarant has been established, the Supreme Court has indicated what factors must be present in order to comply with the purposes behind the confrontation requirement. Thus, in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Court held preliminary hearing testimony admissible as against a Confrontation Clause attack, noting that (1) the declarant was under oath, (2) the defendant was represented by the same counsel who later represented him at trial, (3) the defendant had every opportunity to cross-examine the declarant, and (4) the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings. *Id.* at 165, 90 S.Ct. at 1938. If these elements are present, the transcript bears a sufficient indicia of reliability and affords the trier of fact a satisfactory basis for evaluating the truth of the prior statement. *Ohio v. Roberts, supra*, 448 U.S. at 73, 100 S.Ct. at 2542-43.

In the instant case, we hold that defendant was not denied his sixth amendment confrontation right when the trial court admitted the suppression hearing testimony. It is undisputed that Jones was involved in a serious accident after the suppression hearing and was unable to testify at trial. At the time his testimony was given, Jones was under oath at the suppression hearing and defendant was represented by the same counsel who represented him at trial. Finally, defense counsel conducted a

thorough cross-examination in an attempt to show that the defendant's statements were involuntary. In short, the demands of the Confrontation Clause were satisfied here.

Finally, defendant contends that the trial court erred when it allowed the reading of a written statement prepared by defendant which was given to Jones. Defendant asserts that the statement was improperly admitted because Jones was not available to provide a proper foundation for the statement. In order to prove an admission or declaration it is necessary to show that the statement is relevant and material to the issues of the case and that the statement was, in fact, made by the declarant. *See generally* 29 Am.Jur.2d, *Evidence*, § 598. Such matters of determination are within the discretion of the trial court. *See State v. Ray, supra;* 17A A.R.S. Rules of Evidence, rule 104. Defendant does not dispute the genuineness of the written statement, nor does he question its relevancy or materiality. Therefore, we find no error.

## PRISON RECORDS

On the last day of trial, defendant offered into evidence one page of chronological notes of his prison records made at the Utah State Penitentiary. The portion of the record which defendant sought to introduce reflected that defendant had been placed in maximum security because of his fear of being labeled a "snitch" at the prison. Defendant attempted to introduce these records in order to corroborate his professed fear of being a "snitch" as an explanation for initially lying to investigating officers regarding how he had acquired the Cadillac. Defendant's testimony at trial tended to incriminate an escaped Utah State Prison inmate.

The entire prison record was 25 pages in length, of which defendant attempted to introduce only a small portion. The prosecutor objected to its admission, arguing that the portion sought to be introduced was taken out of context and that he had not been given an opportunity to examine the 25–page prison record. The trial court sustained the objection and defendant now maintains this ruling constituted prejudicial and reversible error.

Again, we must observe that the trial court is allowed considerable discretion in determining the admissibility of evidence and such discretion will not be disturbed on appeal unless it has been clearly abused. *State v. Tulipane,* 122 Ariz. 557, 596 P.2d 695 (1979); *State v. Macumber,* 119 Ariz. 516, 582 P.2d 162, *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). In this instance, the trial court acted well within its discretion by excluding the proffered exhibit.

Although the entry offered noted that defendant had requested protection because he had been labeled a "snitch," the very next entry indicated that defendant was "getting no pressure from anyone" and that "everything is going fine." Understandably, defendant did not wish to have this portion of the prison record admitted. This fact indicates the unreliability of the proffered exhibit. The trial court did not err in sustaining the State's objection.

## STATE'S EFFORTS TO OBTAIN FINGERPRINTS OF THE "FRENCH PEOPLE"

After giving numerous accounts as to how he came into possession of the victim's Cadillac and credit cards, at trial defendant admitted that all of his prior accounts were false. Defendant then testified that he was introduced to a "French couple" by escaped convict James Travis at the Roadrunner Truck Stop in Phoenix. Defendant observed the "French couple" to be very nervous and learned they were driving a new Cadillac. Suspecting the Cadillac to be stolen, defendant "conned" them into trading the Cadillac for his own stolen Ford Fairmont. The couple agreed and an exchange was made at the truck stop. At this time, defendant purportedly received a piece of paper from the "French couple" with their names and addresses in France. As related earlier, the Ford was the vehicle found abandoned north of Flagstaff. A number of unidentified fingerprints were

lifted from the vehicle by Coconino County Deputy Sheriffs.

Defendant sought to verify whether any such people existed and requested the State to obtain their fingerprints from the United States Department of State. Defendant now maintains that the State did not make a good-faith effort to obtain the fingerprints, thus depriving defendant of a fair trial.

We have said:

"[T]he state has an obligation pursuant to rule 15.1 [17 A.R.S. Rules of Criminal Procedure] to disclose such information not in its possession or under its control if the state has better access to the information; if the defendant shows that it has made a good faith effort to obtain the information without success; and if the information has been specifically requested by the defendant." State v. Smith, 123 Ariz. 231, 239, 599 P.2d 187, 195 (1979).

Defendant, relying on this statement in Smith, maintains that the United States Department of State and American Consulate in France, being federal government agencies, were more likely to cooperate with the State than the defense and thus the State had better access to the information. We find this argument to be specious.

First, the claim that the State did not make a good-faith effort to obtain the fingerprints of the "French couple" rings hollow in view of the fact that defense counsel had informed the trial court that "[w]e have contacted the Department of Justice and the French Consulate, have made long distance calls to Paris, and reached a blank wall in any further efforts we can do to get the French people or the passports or pictures which are important. We have requested the State to do this for us. And I think they are all doing it—*I think they are vigorously working on this.*" (Emphasis added). The prosecutor stated that he contacted the Federal Bureau of Investigation immediately after he and defendant's counsel had discussed the matter. Three weeks later, the trial court inquired how the investigation regarding the French people was

coming along. Defense counsel agreed that nothing had been discovered and additionally stated that he was satisfied that all that could be done had been done.

Second, we do not view Smith as controlling here. Defendant would extend our holding in Smith so as to place an obligation on the State to seek out information requested by the defense any time another governmental body is involved. In the context of Smith, we stated that "[a]nother law enforcement authority is far more likely to cooperate with the prosecution than with defense counsel." 123 Ariz. at 239, 599 P.2d at 195. In the present case, the prosecutor contacted the FBI in order to obtain the information requested. This inquiry proved fruitless. At this point the State did all it was obligated to do under Rule 15.1 and Smith. It did not have the obligation to conduct an extensive investigation in order to support defendant's case nor did it have an obligation to carry this inquiry any further under the flawed assumption that the State would meet with any greater success merely because it was dealing with a governmental body. Defendant does not argue that the Department of State or Consulate was uncooperative nor does he say what more the State could have done. As noted above, defendant did not complain of lack of a good-faith effort on the part of the State in the court below. With these factors in mind we conclude that defendant was not deprived of a fair trial.

PHOTOGRAPH OF THE DECEASED

Defendant complains that the trial court erred in admitting a photograph of the deceased because it was so gruesome and inflammatory that it incited the passions of the jury and prejudiced the defendant. See 17A A.R.S. Rules of Evidence, rule 403.

 Trial courts have great discretion in the admission of photographs. State v. Clark, 126 Ariz. 428, 616 P.2d 888, cert. denied, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). As long as the photograph has some probative value it is admissible even if inflammatory. Id. Admission is proper where the photograph aids to

identify the victim, to illustrate how the crime was committed, to aid the jury in understanding testimony, and to show the location of the mortal wounds. *State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981).

█ The photograph admitted at defendant's trial showed the partially decomposed corpse of the victim with a rope tied around the remains of the neck. The picture is in black and white and without close examination it is difficult to discern that the photograph is actually that of a human body. In our opinion, the photograph was not so gruesome so as to inflame or prejudice the jurors.

Further, the photograph was the only one available to show how the cord used for the strangulation was placed around the victim's neck. In addition, the photograph was used by the Yavapai County Medical Examiner in order to explain to the jury now how the cord was knotted. Thus, the photograph illustrated testimony at trial and aided the jury in understanding how the crime was committed. The trial court did not abuse its discretion in admitting the photograph.

SUFFICIENCY OF THE EVIDENCE

█ Defendant argues that there are no probative facts to support the verdict and thus the conviction should be reversed for lack of substantial evidence.

In *State v. Tison,* 129 Ariz. 546, 633 P.2d 355 (1981), we re-examined the standard of review utilized by Arizona appellate courts in determining whether there is substantial evidence to support a guilty verdict. We concluded that the approach employed in Arizona equates with the mandate in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requiring reviewing court to find that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. In reaching this conclusion we stated "[o]ur review function will therefore be concerned with whether there exists substantial evidence from the entire record from which a rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Tison, supra,* 129 Ariz. at 553, 633 P.2d at 362.

The State's case against the defendant consisted entirely of circumstantial evidence. Defendant relies on this absence of direct evidence in arguing there were no probative facts to support the verdict. However, as we stated in *Tison, supra,* "[t]he lack of direct evidence of guilt does not preclude [a verdict of guilty] since a criminal conviction may rest solely upon proof of a circumstantial nature. *State v. Carriger,* 123 Ariz. 335, 599 P.2d 788 (1979), *cert. denied,* 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980). It is unnecessary for the prosecution to negate every conceivable hypothesis of innocence when guilt has been established by circumstantial evidence. *State v. Olivas,* 119 Ariz. 22, 579 P.2d 60 (App. 1978)." 129 Ariz. a 554–555, 633 P.2d at 363–364.

After reviewing the entire record, we are of the opinion that there was sufficient evidence from which a rational trier of fact could have found guilt beyond a reasonable doubt. Without recounting every incriminating fact which would support the conviction, we observe that defendant gave numerous contradictory versions as to how he came into possession of the victim's Cadillac; denied using the victim's credit cards, and stated he had never been in Arizona until he discovered that the authorities could place him there on several occasions; personal effects belonging to the victim were found in the Ford Fairmont; a diamond ring belonging to the victim was found on Wilma Horrocks' finger; although defendant professed to have never met Larry Grove, he apparently knew that the victim was an elderly man when stopped by the New York State Trooper; defendant testified that several items of personal property found in the Cadillac were his, although other witnesses testified that they belonged to the victim. Based upon these facts and other evidence presented by the State, we cannot say that the jury was unjustified in disbelieving defendant's version of how he acquired the Cadillac. We find no error.

## JURY INSTRUCTIONS

Defendant urges that the trial court erred in failing to give a portion of defendant's requested instruction which dealt with the question of voluntariness of statements made by him to the police officers. He also contends the trial court erred in refusing to give a requested instruction which would have told the jury, in effect, that they were to exercise their individual opinions when considering the evidence.

▮ With respect to the voluntariness instruction, defendant's counsel made no objection to the trial court's decision to omit a portion of the requested instruction. As such, defendant may not now claim error, 17 A.R.S. Rules of Criminal Procedure, rule 21.3(c), unless the error is fundamental. *State v. Dickey*, 125 Ariz. 163, 608 P.2d 302 (1980). We find no fundamental error here.

▮ As to the "individual opinion" instruction, we agree with the trial court's view that this area was adequately covered by the standard instructions given by the court.

## IMPOSITION OF THE DEATH PENALTY

After conducting an aggravation-mitigation hearing pursuant to former A.R.S. § 13–454(C), *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the trial judge found two aggravating circumstances, A.R.S. § 13–454(E)(1) and (2). The trial court stated:

> "1. The defendant has been convicted of another offense in the United States for which under Arizona law sentence of life imprisonment or death was imposable, namely: He was convicted of second degree murder . . . .
>
> "Number 2. The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person, namely: The murder committed as set forth in circumstance one above was by strangulation."

The trial judge found that the fact that the jury was given a felony murder instruction may be considered a mitigating circumstance, but went on to state that there was "no evidence or information to permit the Court to find that the murder was a mere consequence of the felony." The court also found that the fact that defendant was a model prisoner was a mitigating circumstance. In conclusion, however, the court found that these mitigating circumstances were not sufficiently substantial to call for leniency and sentenced defendant to death.

Defendant does not dispute the finding of the aggravating circumstances but disputes the trial court's finding of mitigating circumstances. Defendant contends that the following mitigating circumstances exist and are sufficient to call for leniency:

1. There is doubt of guilt for sentencing purposes.

2. Defendant is a model prisoner who gets along well in prison.

3. A felony murder instruction was given and the evidence did not show that defendant had a "requisite intent to kill."

4. There was a lack of specific intent to cause death.

▮ Unlike appellate review of non-capital crimes, our duty on review of the death penalty is to conduct an independent examination of the record to determine whether the death penalty was properly imposed. *State v. Vickers*, 129 Ariz. 506, 633 P.2d 315 (1981); *State v. Watson*, Ariz., 628 P.2d 943 (1981).

From our examination of the record, we conclude that the two aggravating circumstances were properly shown.

We agree with the trial court's finding that the giving of a felony murder instruction may be considered as a mitigating circumstance. The fact that defendant is a model prisoner may also be considered by the court. The evidence of circumstances presented by the defendant, we do not consider to be mitigating. First, we have already determined that there was sufficient evidence to support the verdict; thus, there

is no merit in defendant's contention that there was doubt of guilt. Defendant's third and fourth mitigating circumstances essentially stand for the same proposition, that there was no showing of a specific intent to kill the victim.

We have recently addressed similar arguments in *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825, *cert. denied*, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). In *Jordan* we noted that when a defendant acts with the knowledge that his behavior is substantially likely to cause a result he is considered to intend that result. *Id.* at 288, 614 P.2d at 830.

In the present case, the victim died by asphyxiation by ligature strangulation. We believe that it is reasonable to conclude, in the absence of any evidence to the contrary, that one who undertakes to strangle another human being, had the purpose of causing death or had the substantial knowledge death would result. *Cf. State v. Jordan, supra*. Defendant did not introduce any evidence to rebut this inference other than advancing a "theory" that defendant may have specifically intended only to steal an automobile and some money, but in the course of so doing, the victim may have attacked him, causing defendant to grab a rope within reach, resulting in the strangulation. In view of the fact that the victim was a 74-year-old man and the defendant was 35 at the time of the crime, we find defendant's "theory" to be implausible and insufficient to prove lack of specific intent to cause death.

After conducting our independent examination of the record and weighing the aggravating and mitigating circumstances against each other, we must agree with the trial court's determination that the mitigating circumstances are not sufficiently substantial to call for leniency. The sentence of death was properly imposed.

## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTE

Finally, defendant maintains that imposition of the death penalty under former A.R.S. § 13–454 is unconstitutional.

First, defendant argues that the statute as applied pursuant to *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), is an *ex post facto* law; second, that the statute is unconstitutional because it does not require the prosecution to prove the totality of the aggravating circumstances outweigh the totality of the mitigating circumstances beyond a reasonable doubt; and finally, the statute is unconstitutional because it leaves the imposition of death to a one-man judge rather than to a jury. As defendant recognizes, we have been presented with these arguments numerous times and have rejected them. *State v. Steelman*, 126 Ariz. 19, 612 P.2d 475, *cert. denied*, 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980); *State v. Jordan, supra; State v. Smith*, 125 Ariz. 412, 610 P.2d 46 (1980); *State v. Watson, supra*.

The judgment of guilt and sentence of death are affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and CAMERON and GORDON, JJ., concur.