UNITED STATES of America,
Plaintiff-Appellee,

v.

Bobby COOK and Laurell Cook,
Defendants-Appellants.

Nos. 75–1416, 75–1424.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 23, 1975.

Decided Feb. 10, 1976.

Rehearing Denied in No. 75–1416
Feb. 26, 1976.

Certiorari Denied June 1, 1976.
See 96 S.Ct. 2234.

Dennis E. Zahn, Preston T. Breunig, Indianapolis, Ind., for defendants-appellants.

James B. Young, U. S. Atty., Charles Goodloe, Jr., Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before TONE and BAUER, Circuit Judges, and HOFFMAN *, Senior District Judge.

BAUER, Circuit Judge.

Petitioners appeal from their convictions in a joint trial for bank robbery.

* The Hon. Julius J. Hoffman, Senior District Judge, Northern District of Illinois, is sitting by designation.

Laurell Cook contends that the district court erred by admitting evidence against him obtained in an allegedly unlawful search and by not declaring a mistrial after a government witness testified to a confession made by co-defendant Bobby Cook inculpating him. Bobby Cook contends that the district court erred by not allowing him sufficient pretrial discovery, by admitting an oral statement he made to government officers, by denying him the opportunity to cross-examine a witness and by refusing to give the jury particular instructions.

We reverse Laurell's conviction and affirm Bobby's conviction.

### I.

On November 19, 1973, the Peoples Loan and Trust Company of Modoc, Indiana was robbed. After the robbery the FBI conducted an investigation and discovered the possible involvement of the appellants. On November 29, the FBI obtained from Laurell Cook's landlady, Mrs. Pearl White, her consent to search a poultry house on Mrs. White's property in part used by Laurell Cook. Incriminating items seized in the ensuing search were later admitted at trial against Laurell Cook.

About a year later, on November 22, 1974, appellant Bobby Cook was arrested near Eau Claire, Wisconsin on a warrant for firearms violations. After the arrest, he was given a proper *Miranda* warning by FBI Special Agent Eugene I. Sather and in response to the agent's interrogation gave a written statement in which he admitted his participation in the Modoc bank robbery. Three days later, while Special Agent Sather and Sergeant David Malone of the Eau Claire Police Department were transporting Bobby to the United States Magistrate's Office for a bond hearing, Bobby orally admitted complicity in the bank robbery.

1. Our decision in *Matlock* was reversed by the Supreme Court, *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), on a question regarding the admissibility of hearsay evidence. The Supreme Court did not consider the standard applied by the district court and affirmed by this Court with regard

In January, 1975, appellants were indicted for the bank robbery. Bobby Cook's motion to suppress his written confession of November 22, 1974 was overruled after a hearing. Laurell Cook's motion for a separate trial was also overruled and each appellant was found guilty by a jury after a joint trial.

### II.

Laurell Cook first alleges that the search of the poultry house was unlawful since the government did not meet the standard for third-party consent searches set forth by this court in *U. S. v. Matlock,* 476 F.2d 1083, 1087 (7th Cir. 1973):[1]

"[D]efendant's constitutional rights [can] be waived only if it [is] proved that reasonable appearance of authority to consent existed and, also, that just prior to the search, facts existed showing actual authority to consent."

The government must prove these things by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242, fn. 14 (7th Cir. 1974). See *Lego v. Twomey,* 404 U.S. 477, 488–489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

As to the first leg of the test (reasonable appearance of authority to consent), Cook argues that the government did not meet its burden of proof on this issue since the trial testimony indicated that the FBI did not ask Mrs. White about her actual authority over the poultry house.

While it is true that Mrs. White testified that she could not remember the FBI asking her about her rights in the poultry house, and no other testimony contradicts her statement, we think the facts establish the necessary appearance of authority. The poultry shed was rela-

to the consent search: "We do not understand the government to contend that the standard employed by the District Court was in error, and we have no occasion to consider whether it was." 415 U.S. at 177, 94 S.Ct. at 996, fn. 14.

tively near the White house, being 50 feet west of that house, which was 200 feet north of Laurell's house. Mrs. White's act in giving consent was some indication that she had authority to do so, when that act was coupled with repeated references to the shed as hers. In the consent form she signed for the FBI, she clearly indicated that she considered the poultry house as belonging to her. Twice the poultry house is referred to with the word "my": "my poultry house and workshop"; "my premises".[2] Under the circumstances, there was a reasonable appearance of authority in Mrs. White to consent to the search.

█ We now turn to the second leg of the *Matlock* standard: actual authority to consent. In the Supreme Court opinion in *Matlock*, the Court deduced from the recent cases that a warrantless search may be conducted if consent is "obtained from a third-party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected" (415 U.S. at 171, 94 S.Ct. at 993). They explained the meaning of common authority in a footnote:

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched", 415 U.S. at 171, 94 S.Ct. at 993, fn. 7.

The record in the case at bar indicates that the interior of the poultry house is one large room in which the Whites have segregated one area with wire fence for their exclusive use. The Whites gave Cook permission to use the rest of the space as he wished. Cook used the allotted space, except for a corner where the Whites stored some disused chicken roosts.

Mrs. White testified that she had told Cook that her son, a farmer, might use the area to store surplus grain if an emergency arose, but she could not recall any occasion when her son had so used the space. Pressed by counsel, Mrs. White conceded that her family did not use the large area of the poultry house, but added that "if we felt like we wanted to, we felt we still could [use it]" (Tr. 284).

In summary, Laurell Cook was the actual user of the large area of the poultry house, except for the Whites' storage of the chicken roosts in one corner. The owner, Mrs. White, maintained the right for her or members of her family to use the area if the necessity arose.

These facts require us to make a rather subtle interpretation of the aforementioned footnote from the Supreme Court opinion in *Matlock* explaining the common authority which justifies a third-party consent. Cook argues that the dominant aspect of common authority is "mutual use of the property by persons having joint access or control for most purposes." He asks us to read the following clause, "so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched," as qualified by the preceding clause. Under this reading, Cook argues, Mrs. White had no common authority over the premises since neither she nor any one else in her family actually *used* the premises or generally had joint access or control *for most purposes* since she testified that she maintained a right to access only if the need to use the area arose.

The government replies that the "mutual use" phrase should be read as modified by the succeeding "so that" phrase.

2. Per government Exhibit 17A.

This reading would shift the analysis from one of actual use to one of assumption of the risk that the other party would exercise his right to enter upon and inspect the premises and to permit others to do so.

Under this analysis, Mrs. White would have actual authority to consent to the search. The record shows that Cook recognized that members of the White family might preempt the storage space for their needs. He knew that the Whites actually used one corner of the storage space to store chicken roosts and were entitled to enter the area to remove their property. He also knew that they made exclusive use of one area of the shed, which was separated only by metal screening from the rest of the shed and apparently had no separate entrance. If the Whites maintained such a right to use the premises, it would be foreseeable for them to inspect the premises or to permit other persons to use or inspect the premises. Thus, because the Whites retained such broad control over the premises, we must recognize that Cook had assumed the risk that they might permit others to inspect the premises. See *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

■ This assumption of risk analysis has predominated in recent Fourth Amendment cases and suggests to us that the government's reading of the *Matlock* footnote is the proper one. This court so interpreted the *Matlock* footnote in *United States v. Piet*, 498 F.2d 178, 181 (7th Cir. 1974). In *Piet*, Judge Castle found a valid consent to the search of a warehouse in which goods were found which incriminated the defendant since the consenter's possession of the keys to the warehouse showed he "had access and control over the common area" and the court concluded that the defendant "had no reasonable expectation of privacy respecting the storage of his goods . . . and assumed the risk that the persons in charge of the facility might willingly and voluntarily grant permission for agents to enter and search the common areas." The facts in

the *Piet* case are not as significant for our purposes as the court's analysis: Judge Castle ultimately found the existence of common authority on the basis of the defendant's assumption of the risk that permission for inspection might be granted. The terms "mutual use of the property by persons generally having access or control for most purposes" were clearly given content by the later phrase and the determining factor in the decision was that of assumption of the risk. *Accord, Virgin Islands v. Gereau*, 502 F.2d 914, 926 (3rd Cir. 1974); *United States v. Jenkins*, 496 F.2d 57, 72 (2d Cir. 1974); *contra, United States v. Heisman*, 503 F.2d 1284, 1288–89 (8th Cir. 1974). On the basis of this reading of footnote 7 in *Matlock*, we find that the district court properly held that actual authority to consent to the search of the poultry house existed at the time consent was given.

■ Laurell Cook's alternative argument for suppressing the evidence obtained in the search, that the government made no showing as to why a search warrant was not obtained, must also fall. The law does not require a showing of such an attempt, since a valid consent to search is characterized as a waiver of Fourth Amendment protections including the need to obtain a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Zap v. United States*, 328 U.S. 624, 630, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946).

### III.

Laurell Cook's second allegation of error is that the district judge erroneously refused to grant a mistrial after a government witness testified to a confession made by co-defendant Bobby Cook inculpating Laurell.

■ The reference to Laurell Cook was made by Sergeant Malone of the Eau Claire, Wisconsin, Police Department while testifying to the statement made by Bobby Cook when Bobby was being transported to the United States

Magistrate for a bond hearing after his arrest. Malone's testimony, in context, was:

> Witness Malone: "All right. At that point Mr. Cook said that he couldn't understand other charges and that he couldn't understand how certain material was found in his car. The only thing that he could think of was that after the bank robbery. . . ."
>
> Mr. Breunig (counsel for Bobby Cook): "I will object to this, your Honor. I don't think this is in response to the question."
>
> Mr. Goodloe (counsel for the government): "The question was what he said."
>
> The Court: "Go ahead. You may continue."
>
> Witness Malone: "That after the bank robbery, when cars were switched, that his brother Larry. . . ."
>
> Mr. Goodloe: "Excuse me."
>
> Mr. Zahn (counsel for Laurell Cook): "Objection."
>
> The Court: "Well, I will sustain the objection."
>
> Mr. Zahn: "At this time, your Honor, I am going to move for a mistrial."
>
> Mr. Goodloe: "I don't think he's said anything."
>
> The Court: "Well, he hasn't really said anything yet, fortunately.
>
> But I think we will excuse Mr. Malone. You are excused, Mr. Malone.
>
> And, members of the jury, you will disregard everything Mr. Malone has said. It is not evidence in this case. And as a matter of fact, he hasn't said anything that would be material to this case that I have heard." Transcript pp. 405–406.

Laurell Cook's motion for a mistrial based on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), was denied by the district court on the ground that Laurell was not prejudiced since: (1) the reference to "Larry" did not necessarily refer to co-defendant Laurell Cook, (2) the statement was unintelligible since it was never finished, and (3) the judge struck the statement from the record and told the jury to disregard it.

We respectfully disagree with the district court and find that in the context of this case the statement sufficiently prejudiced co-defendant Laurell Cook so as to constitute grounds for a mistrial.

First, we think the reference to "his brother Larry" was enough to inform the jury that Laurell Cook was referred to. The combination of the reference to "Larry", a likely nickname for someone named Laurell, and the reference to Bobby Cook's "brother", in a joint trial in which both defendants are named Cook and are charged with the same offense, leaves little room for other inferences to be drawn by the jury.

Second, we think the context of the reference was such that in the minds of the jurors it connected Laurell to the bank robbery. Two factors suggest this: the timing of the Malone testimony and its content. Malone testified to Bobby Cook's statement immediately after FBI Special Agent Sather, the other person present when Bobby Cook made the statement, testified that Bobby Cook admitted robbing the bank. This prior testimony added meaning to the statement recalled by Malone. Rather than just referring to what Bobby Cook did after the time the bank was robbed by whomever committed the robbery, the prior testimony enhanced the statement to mean Cook was referring to what *he* did after *he* robbed the bank.

The second important factor is the reference in the statement testified to by Malone to switching the cars after the bank robbery. In presenting its case the government entered much evidence regarding the cars used in the robbery. In particular, the government showed before Malone took the stand that a stolen getaway car was abandoned near Laurell Cook's home and that incriminating items allegedly discarded by the robbers along the escape route were found nearby. Since the only evidence presented against Laurell Cook was circumstantial, the linking of the getaway cars to him was crucial to the government's case. In this context, Malone's testimony connect-

ing the crucial evidence regarding the getaway cars with Bobby Cook's confession appears to us as highly significant and extremely prejudicial to Laurell Cook.

Finally, contrary to the government's argument, this case should be reversed despite the judge's admonition to the jury to disregard Malone's testimony. *Bruton* clearly holds that such an instruction in a joint trial is not "an adequate substitute for petitioner's constitutional rights of cross-examination", 319 U.S. at 137, 88 S.Ct. at 1628.

■ The finding of a violation of the *Bruton* rule does not always require the reversal of the criminal conviction.

"In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error". *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972).

■ In the case at hand, the error cannot be characterized as harmless since the erroneously admitted evidence in this case is highly significant in comparison to the properly admitted evidence. The reference to Laurell in Bobby Cook's confession was the strongest evidence in the case against Laurell, not only because the statement suggested Laurell was Bobby's accomplice, but also because the reference to switching cars together with the mention of Laurell's name connected the circumstantial case against Laurell with the case based on a confession against Bobby. In light of this context, we cannot say that the error here was harmless and we are remanding this case for a new trial.

## IV.

We now turn to the allegations of error presented by petitioner Bobby Cook.

### DISCOVERY

■ Cook first alleges that the district court improperly refused to order the government to produce before trial (a) the FBI case report on the bank robbery, (b) the FBI summaries with regard to the investigation and statements of Bobby Cook, and (c) a list of the names and addresses of all witnesses the government intended to call at trial against Bobby Cook. The thrust of petitioner's argument appears to be that despite the absence of any statutory requirement for the production of the requested material, and despite the fact that neither the version of Rule 16 of the Federal Rules of Criminal Procedure applicable at the time [3] nor the Jencks Act, 18 U.S.C.

---

**3.** The pertinent parts of Rule 16 as it existed at the time of the trial in the case at bar provided for the discovery of:

"(a) *Defendant's Statements; Reports of Examinations and Tests; Defendant's Grand Jury Testimony.* Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, (2) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession, custo-

dy or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and (3) recorded testimony of the defendant before a grand jury.

(b) *Other Books, Papers, Documents, Tangible Objects or Places.* Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, upon a showing of materiality to the preparation of his defense and that the request is reasonable. Except as provided in subdivision (a)(2), this rule does not authorize the discovery or inspection of reports, memoranda, or other in-

§ 3500,[4] authorize their disclosure, this Court should require their disclosure since, without them, the petitioner was severely hampered in the preparation of his case and thus did not receive a fair trial. The petitioner further argues that the district court should have taken this action under its "inherent power to require the prosecution to produce the previously recorded statements of its witnesses so that the defense may get the full benefit of cross-examination and the truth-finding process may be enhanced." *United States v. Nobles*, 422 U.S. 225, 231, 95 S.Ct. 2160, 2166, 45 L.Ed.2d 141 (1975).

We do not agree. The trial court did not abuse its discretion in refusing to order the disclosure in a case where the materials sought are not required to be disclosed by statute or by rule. *United States v. Verse*, 490 F.2d 280, 282 (7th Cir. 1973); *United States v. Pope*, 409 F.2d 371, 374 (7th Cir. 1969).

## COOK'S ORAL STATEMENTS

At the trial Special Agent Sather and Sergeant Malone testified to the contents of the oral statement made by Bobby Cook when they were transporting him to the magistrate after his arrest. At the time of the testimony, Cook's attorney objected to the admission of the statement on the ground that an appropriate foundation for its admission had not been laid. Cook now argues that the statement should not have been admitted into evidence because (1) the government failed to prove that he intelligently waived his Fifth Amendment privilege and (2) the government

failed to prove that the statement was voluntarily given.

■ The substance of Cook's first argument is that Cook made his statement without having been given appropriate *Miranda*[5] warnings, or, in the alternative, that there was no showing that Cook had accepted the warnings. Three days earlier, it will be recalled, Cook had been given an appropriate *Miranda* warning and had given a written statement in which he admitted participating in the robbery. Since the record indicates that the oral statement in issue was given on Cook's initiative rather than as a result of interrogation, *Miranda* is inapplicable and we need not consider whether an additional *Miranda* warning would have been necessary if further interrogation was to occur.

The Supreme Court in *Miranda* explicitly stated that voluntary statements not in response to police interrogation are admissible against defendants despite the absence of a showing of a knowing and intelligent waiver of the Fifth Amendment privilege:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred

---

ternal government documents made by government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses (other than the defendant) to agents of the government except as provided in 18 U.S.C. § 3500."

**4.** 18 U.S.C. § 3500 states, in pertinent part:

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which

was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

Petitioner's attorney conceded at oral argument that this material was not discoverable under the aforementioned statutes.

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda v. Arizona*, 384 U.S. at 478, 86 S.Ct. at 1630.

See also *United States v. Duke*, 369 F.2d 355, 358 (7th Cir. 1966), *cert. denied*, 386 U.S. 934, 87 S.Ct. 957, 17 L.Ed.2d 806, *reh. denied*, 386 U.S. 1000, 87 S.Ct. 1302, 18 L.Ed.2d 354 (1967); *United States v. Martin*, 511 F.2d 148, 151 (8th Cir. 1975); *United States v. Wiggins*, 166 U.S.App. D.C. 121, 509 F.2d 454, 460 (1975); *United States v. Hopkins*, 486 F.2d 360, 362 (9th Cir. 1973); *United States v. Sanchez*, 449 F.2d 204, 209 (5th Cir. 1971); *United States v. Godfrey*, 409 F.2d 1338 (10th Cir. 1969).

The circumstances surrounding the statement in the case at hand were testified to by Agent Sather:

> "He made a statement just as I entered the . . . .. That he wanted to talk further about the matter we discussed the previous Friday, which was the 22nd of November, 1974. And at that point, we were just in the process of taking custody of Bobby Cook to transport him from Barron, Wisconsin, to Eau Claire, which is for the magistrate's hearing, and I instructed them at that time not to say anything further until we got in the car because we had to take custody of 'his personal effects and so forth that were there and sign that out, and that we could discuss this, whatever he had to discuss, in the car on the way down. And he insisted on continuing to talk, and it was at this point he made mention: 'I didn't have anything to do with the charge I was arrested, for what I have been arrested, and I want to discuss that further; but I did rob the bank." Transcript pp. 400–401.

If the agent's testimony is credited, Cook's statement was clearly volunteered and not given in response to official interrogation. What we have said also disposes of petitioner's argument that the statement was not voluntary.

## DENIAL OF CROSS–EXAMINATION

Petitioner argues that he was prejudicially denied his opportunity to cross-examine Sergeant Malone of the Eau Claire Police Department when Malone's testimony regarding Bobby Cook's oral confession was cut off after Malone mentioned co-defendant Laurell Cook. Cook waived his right to cross-examine Malone since he did not request the district court to allow him to do so. In any event, we do not believe this inability to cross-examine Malone was sufficiently prejudicial to Bobby Cook to warrant a reversal. Malone testified to the same oral statement testified to by the immediately prior witness, Agent Sather, whom petitioner had an adequate opportunity to cross-examine.

## JURY INSTRUCTIONS

Petitioner's final argument is that the district court erroneously refused to give certain jury instructions. All of the instructions suggested by petitioner were given to the jury in different forms. The variations in language and emphasis between those given and those desired by the petitioner are not substantial enough to warrant our reversal of the jury verdict.

### V.

In conclusion, we reverse the conviction of Laurell Cook on the basis of *Bruton v. United States* and affirm the conviction of Bobby Cook.

No. 75–1416 affirmed;

No. 75–1424 reversed and remanded.