STATE OF NORTH CAROLINA v. ALLEN EDWARD WASHINGTON

No. 863SC877

(Filed 7 July 1987)

**1. Searches and Seizures § 16— defendant residing with mother—search of mother's house—search of outbuildings not protected**

Defendant's possessory interest conferred standing to challenge the search of his mother's house where he regularly resided, and his protected expectation of privacy extended to the curtilage of the house as well; however, a tobacco barn, packhouse, and hog shelter which were 50 to 75 feet from defendant's residence were not so intimately associated with domestic life and the privacies of home as to be within the curtilage of defendant's residence.

**2. Searches and Seizures § 16— outbuildings—no exclusive control or privacy interest of defendant**

Defendant had no privacy interest in outbuildings by virtue of his alleged exclusive control, since defendant never used any of the outbuildings; the outbuildings were never locked or secured; and the outbuildings were in the "open fields" outside the curtilage of defendant's house.

**3. Searches and Seizures § 16— defendant residing with mother—outbuildings— no exclusive control by defendant—mother's consent to search proper**

There was no merit to defendant's argument that he had such "exclusive" control over outbuildings that his co-occupant mother was not empowered to consent to their search, since the mother never relinquished her right of access or control in the outbuildings and could permit the search in her own right, and defendant assumed the risk that his mother might at some time permit a search.

**4. Searches and Seizures § 16— defendant residing with mother—areas controlled by both—mother's consent in presence of defendant proper**

Defendant could not complain that his mother could consent to a search of premises over which they had common authority only in his absence, since defendant was either outside the house or inside a patrol car outside the house throughout the search, but defendant did not refuse consent to the officers or communicate any refusal to his mother.

**5. Searches and Seizures § 14— consent to search—voluntariness**

Consent to search outbuildings and a car was voluntarily given by defendant's mother, though a coercive threat of arrest was made, where the threat occurred after the consent searches of the car and outbuildings, and where the mother testified that she was not intimidated by the deputy's threat and would have let the officer search in any event.

**6. Searches and Seizures § 18— search of vehicle—consent by defendant's mother as owner proper**

Defendant was not the proper person to consent to the search of an automobile where his mother was the registered owner of the vehicle, and he was

not in apparent control of the car's operation and contents at the time the consent was given.

**7. Larceny § 7.10— nine days between taking and discovery of goods—unique goods—application of doctrine of possession of recently stolen property proper**

Unique tools and metal work found on premises shared by defendant and his mother were not of a type normally found or traded in lawful channels so that the lapse of nine days between their taking and their discovery did not defeat the inference of defendant's guilt arising from his possession of recently stolen property. This evidence of recent possession together with evidence of tire impressions connecting defendant to the breaking or entering and larceny was sufficient to support the charge of breaking or entering and larceny.

**8. Criminal Law § 138.14— aggravating and mitigating factors—separate findings as to separate offenses**

There was no merit to defendant's contention that the trial court did not separately consider the aggravating and mitigating sentencing factors as to each of defendant's convictions where the court held one sentencing hearing but completed two sentencing forms.

APPEAL by defendant from *Griffin, Jr., William C., Judge.* Judgment entered 28 January 1986 in Superior Court, PITT County. Heard in the Court of Appeals 9 February 1987.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Michael Rivers Morgan, for the State.*

*Assistant Public Defender Robert E. Dillow, Jr., for defendant-appellant.*

GREENE, Judge.

Defendant was found guilty of felonious breaking or entering, felonious larceny and felonious possession of stolen goods. The trial judge arrested the conviction for felonious possession of stolen goods and sentenced defendant to 20 years in prison. Defendant appeals, assigning error to the denial of his motions to suppress evidence and dismiss certain charges and to the trial court's sentencing procedure.

At a suppression hearing conducted by Judge Watts, defendant argued for suppression of certain evidence obtained without a warrant from defendant's residence. Judge Watts found that defendant, his wife and child resided with Mrs. Washington, defend-

ant's mother, and lived in one bedroom of the house she leased. Defendant did not contribute to the support or maintenance of the house: his mother paid all rent, utilities and other household expenses. Although defendant had actually purchased the car, Mrs. Washington also paid the insurance for and was the registered owner of a 1971 Ford automobile parked in the front yard of the residence. Mrs. Washington never drove the car but had a set of keys to it. Acting on an informer's tip concerning a break-in at the W. A. Gaskins, Inc. garage, sheriff's deputies arrived at Mrs. Washington's home with a warrant for defendant's arrest, but no search warrant. When the officers announced their intention to arrest defendant, Mrs. Washington told them where her son's bedroom was located. Defendant was escorted from the house to a police car in the front yard where he remained throughout the incident. Believing Mrs. Washington to be in control of the premises, the deputies requested her permission to search the premises. At some point, Mrs. Washington executed a consent-to-search form.

Judge Watts found defendant's mother was in charge of the premises and that she freely, voluntarily and knowingly consented to the search of certain outbuildings next to her house. The court also found Mrs. Washington consented to the search of the 1971 Ford automobile. Although the court found that certain coercive police statements vitiated Mrs. Washington's consent to later portions of the search, the court nevertheless found Mrs. Washington's express consent to search the outbuildings and Ford automobile was given prior to such statements. Furthermore, the court found defendant was a guest-invitee at his mother's residence and therefore lacked standing to contest the search of the outbuildings since the court found he had no reasonable expectation of privacy in such structures. Similarly, the court ruled defendant lacked standing to raise the issue of his mother's allegedly coerced consent. Finally, while the court found defendant had standing to contest the search of the 1971 Ford automobile, it also found that, pursuant to N.C.G.S. Sec. 15A-222(2) (1983), defendant's mother had authority as registered owner to permit the search of the car. At no time did defendant himself ever protest these searches. For these reasons, Judge Watts denied defendant's motion to suppress except as to a cooler taken from defendant's house after the allegedly coercive statements. The court

ordered that all other items seized as a result of the search be admitted at trial against defendant.

At trial, the State introduced the items seized from the outbuildings and automobile. Several of the tools and items recovered were painted red and yellow and etched with the initial "G." The State also offered testimony which tended to show the tire treads on defendant's automobile appeared to be the same as certain tire impressions taken at the scene of the crime. Defendant testified he had never been to the Gaskins property, did not break into the garage and was at his mother-in-law's house at the time of the break-in. At the close of all the evidence, the trial court denied defendant's motion to dismiss the felonious breaking or entering charge.

The issues for this Court's determination are: (1) whether defendant had standing to question his mother's alleged consent to search of the outbuildings by virtue of (a) his interest in the curtilage; or (b) his allegedly exclusive control of the outbuildings; (2) irrespective of defendant's standing, whether defendant's mother's consent to search of the outbuildings was valid despite defendant's arguments that (a) he exclusively controlled the outbuildings; (b) his joint consent to the searches was necessary since he was present; (c) his mother's consent to the search of the outbuildings was coerced; (3) whether the mother's consent authorized a warrantless search of the automobile, purchased and generally driven by defendant, but registered in her name; (4) whether the trial court properly denied defendant's motion to dismiss the breaking or entering charge; and (5), in sentencing defendant, whether the trial court properly evaluated the aggravating and mitigating factors pertaining to defendant's separate convictions.

I

Defendant first argues that the evidence at the suppression hearing did not support the court's findings and therefore defendant's motion to suppress should have been allowed. If the trial court's findings of fact are supported by competent evidence, the evidence seized during the search was properly admitted. *State v. Thompson*, 287 N.C. 303, 317, 214 S.E. 2d 742, 751 (1975), *death penalty vacated*, 428 U.S. 908 (1976). Those findings, so supported, are binding on this Court even though there is evidence to the

contrary. *State v. Davis*, 290 N.C. 511, 541, 227 S.E. 2d 97, 115-16 (1976). In determining whether the trial court's findings are supported by the evidence, we look to the entire record, not merely to the evidence presented on *voir dire*. *State v. Moore*, 316 N.C. 328, 333, 341 S.E. 2d 733, 737 (1986) (determining validity of consent searches).

Judge Watts found that Mrs. Washington was "in charge of the premises" and that defendant was a "guest invitee" of his mother. The court therefore concluded Mrs. Washington alone had the authority to consent to the search of "her premises, *including the curtilage thereof, tending to be a tobacco barn and a packhouse, and a hog pen . . . situate on her leased premises.*" (Emphasis added.) The court further concluded defendant had no standing to object to the search of these outbuildings, regardless of his mother's consent, since defendant had no reasonable expectation of privacy in such buildings and structures.

## A

We disagree with the court's apparent conclusion that defendant had no reasonable expectation of privacy in the outbuildings even if they were situated in the curtilage of the house in which he resided with his mother; however, as we find these outbuildings were not within the curtilage proper, defendant nevertheless lacked standing on that basis to challenge the search of these outbuildings.

First, as to the house itself, an individual can show the requisite privacy interest in residential premises by showing either that he owned or leased the premises or that he had an unrestricted right of occupancy, custody or control over them. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). Though the lease to the house and premises was in Mrs. Washington's name, "it is clear that 'capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion . . . .'" *State v. Boone*, 293 N.C. 702, 708, 239 S.E. 2d 459, 463 (1977) (quoting *Mancusi v. De Forte*, 392 U.S. 364, 368 (1968)).

[1] While defendant concededly neither owned nor leased his mother's house, he certainly had a right of occupancy therein. Defendant, his wife and child had resided in the leased house

since November 1984, some four months prior to the searches. Mrs. Washington testified defendant and his family had originally resided alone in the house while Mrs. Washington cared for her own ill mother. There was no evidence that defendant's use of the house or surrounding premises was ever restricted by his mother. Defendant's possessory interest therefore conferred standing to challenge the search of his mother's house where he regularly resided. *See Bumper v. North Carolina*, 391 U.S. 543, 548 n.11 (1968) (no question of defendant's standing to challenge search of grandmother's house where he regularly resided); *Rakas*, 439 U.S. at 136 (defendant in *Bumper* had standing because of "substantial possessory interest" in house searched); *cf. State v. Jones*, 299 N.C. 298, 306, 261 S.E. 2d 860, 865 (1980) (citing *Rakas*, court held defendant failed his burden of proving standing where he did not actually assert possessory interest or other expectation of privacy in parents' garage).

As defendant therefore had a protected expectation of privacy in the house, that protection extended to the curtilage of the house as well: the Fourth Amendment "speaks of the 'houses' of persons, which word has been enlarged by the courts to include the 'curtilage' or ground and buildings immediately surrounding a dwelling . . . ." *Boone*, 293 N.C. at 709, 239 S.E. 2d at 463 (quoting *Rosencranz v. United States*, 356 F. 2d 310, 313 (1st Cir. 1966)). In *Oliver v. United States*, 466 U.S. 170, 180 (1984), the United States Supreme Court identified the central component of the inquiry as whether the alleged curtilage harbors "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The Court has more recently stated the question of curtilage should be resolved with particular reference to four factors: (1) the proximity of the area claimed as curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *United States v. Dunn*, 480 U.S. ---, 94 L.Ed. 2d 326, 334-35 (1987); *cf. State v. Fields*, 315 N.C. 191, 194-96, 337 S.E. 2d 518, 521 (1985) (defendant burglarizes curtilage building only if function of building and proximity to home evidence use for comfort and convenience of dweller). We recognize the *Fields* analysis of a

burglar's alleged intrusion onto "curtilage" may technically be distinguished from our analysis of an officer's alleged intrusion onto constitutionally protected "curtilage"; however, we note that, like our Supreme Court, in *Fields*, the *Dunn* Court rejected the notion that any particular outbuilding, such as a barn, is by definition part of the curtilage. *Cf. Dunn*, 480 U.S. at - - -, 94 L.Ed. 2d at 339 (Brennan, J., dissenting) (collecting earlier state cases holding barns and outbuildings were within curtilage, including *State v. Frizzelle*, 243 N.C. 49, 51, 89 S.E. 2d 725, 726 (1955)).

In the instant case, the tobacco barn, packhouse, and hog shelter were 50 to 75 feet from defendant's residence. *Cf. Dunn*, 480 U.S. at - - -, 94 L.Ed. 2d at 335 (where no exclusionary fence surrounded barn and residence, fact barn was 60 yards from house did not support inference that barn was part of curtilage); *United States v. Van Dyke*, 643 F. 2d 992, 994 (4th Cir. 1981) (where exclusionary fence surrounded residence, curtilage extended 150 feet from house to fence); *but see Fields*, 315 N.C. at 196 n.2, 337 S.E. 2d at 521 n.2 (shed's distance of 45 feet from home was not close enough to show structure was indispensable to comfort and convenience of dwelling). The outbuildings were put to little or sporadic domestic use: Mrs. Washington testified she kept a few hogs in the hog pen, nothing in the barn, and an old mattress, some car parts and a car battery in the packhouse. *Cf. Fields*, 315 N.C. at 196 n.2, 337 S.E. 2d at 521 n.2 (freezer and non-perishable food items in shed not sufficient to show function of comfort and convenience). Mrs. Washington further testified that neither the barn nor the packhouse was locked; nor was there any evidence those structures were in any way fenced with the house.

The proximity of the outbuildings to defendant's house is some evidence these structures should be treated as adjuncts of the house; however, proximity is only one factor demonstrating curtilage under *Dunn* and *Fields*. The instant case demonstrates none of the other curtilage factors cited in those decisions. While such factors do not mechanically delineate the extent of curtilage, they do bear on the "primary focus . . . whether the area in question harbors the intimate activities associated with domestic life and the privacies of the home." *Dunn*, 480 U.S. at - - -, 94 L.Ed. 2d at 335 n.4. In light of the factors enumerated in *Dunn* and *Fields*, we must conclude the outbuildings searched in this case were not so intimately associated with "domestic life and the privacies of

home" as to be within the curtilage of defendant's residence. On this basis, defendant has failed to carry his burden of proving any reasonable expectation of privacy in the buildings searched. *See Jones*, 299 N.C. at 306, 261 S.E. 2d at 865 (defendant has burden to prove standing).

### B

**[2]** Defendant also asserts a privacy basis in the tobacco barn and packhouse independent of the curtilage: defendant argues he acquired "exclusive control" of these structures since his mother testified she never went into them. Since defendant's mother had stored some items in the packhouse, we note defendant's alleged control over that structure could not have been absolutely exclusive. In any event, the exclusiveness of defendant's alleged control *vis a vis* his mother is only relevant to the issue of her consent to any search, not to defendant's standing. *See* 1 W. LaFave and J. Israel, Criminal Procedure Sec. 3.10(e) at 356 (1984) (joint tenant may not consent to search of place under exclusive control of other occupant).

However, defendant's alleged "exclusive control" of the outbuildings is relevant to his standing insofar as it may signify his right to control the outbuildings to the exclusion of all persons *but* his mother. As this Court stated in *State v. Casey*, 59 N.C. App. 99, 113, 296 S.E. 2d 473, 482 (1982), "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [the] right to exclude." (quoting *Rakas*, 439 U.S. at 143 n.12). The expectation of privacy afforded by such right to exclude is not defeated by the fact defendant shares control with and could not lawfully exclude a co-occupant of the premises. *See Rakas*, 439 U.S. at 149 (explaining *Jones v. United States*, 362 U.S. 257 (1960) on basis defendant had such dominion and control that could exclude all but person who gave defendant permission to use apartment and apartment key).

However, we find defendant did not here have any ownership or possessory interests such that he had the right to exclude persons other than his mother from the outbuildings. While we above found defendant had a possessory interest in Mrs. Washington's home and curtilage by virtue of his residence there, we see nothing in the record supporting defendant's possessory rights in these outbuildings. Mrs. Washington testified without contradic-

tion that defendant never used any of the outbuildings, nor were any of these structures locked or secured. Without constructive possession by virtue of some legal title, defendant failed to exercise that actual possession essential to excluding trespassers from the outbuildings: "actual possession of land consists in exercising acts of dominion over it, and in making the ordinary use of it to which it is adapted . . . ." *State v. Baker*, 231 N.C. 136, 139, 56 S.E. 2d 424, 426-27 (1949). *See also* N.C.G.S. Secs. 14-126, 14-134 (1986) (in absence of title, actual possession needed to prosecute trespass to land and fixtures).

Even if we assume *arguendo* defendant's possessory right to exclude others from the outbuildings, the question remains whether defendant had a reasonable expectation of privacy. In *United States v. Ramapuram*, 632 F. 2d 1149 (4th Cir. 1980), *cert. denied*, 450 U.S. 1030 (1981), the car which defendant had used exclusively, but did not own, was stored in an open field on a farm owned by defendant's family. Defendant did not actually reside on the farm. Police found dynamite in the unsecured trunk of the junk car. Conceding defendant's ownership and possessory rights to exclude others, the *Ramapuram* Court nevertheless held "neither interest was sufficient to raise defendant's actual expectation of privacy to a level of constitutional legitimacy." *Id.* at 1156.

In the instant case, the outbuildings were in the "open fields" outside the curtilage of the house. Governmental intrusion upon the "open fields" is not an unreasonable search proscribed by the Fourth Amendment. *Dunn*, 480 U.S. at ---, 94 L.Ed. 2d at 336. "[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage [and] . . . need be neither 'open' nor a 'field' as those terms are used in common speech." *Oliver*, 466 U.S. at 180 n.11. (Aside from the location of these outbuildings in the "open field," we note a piece of vending machine metal work from the Gaskins garage was also found on the ground in the constitutionally unprotected "open field" fifteen feet from the tobacco barn.) Futhermore, defendant in no way attempted to lock or secure the outbuildings or otherwise take those "precautions customarily taken by those seeking privacy." *Ramapuram*, 632 F. 2d at 1156 (quoting *Rakas*, 439 U.S. at 152-53). The hog shelter was open to exposure and Mrs. Washington testified the packhouse had boards missing and was "open." Even if we assume defendant's right to exclude others from the outbuildings, we find, as in *Ramapuram*, that defendant's "possessory

interest in the [outbuildings] was sufficiently lessened to compel the judgment that he could not legitimately expect that the contents of the unlocked [structures] . . . in an open field would remain secure from prying eyes, irrespective of whether those eyes were private or governmental." *Id.* In light of these considerations, we find defendant had no privacy interest in these outbuildings by virtue of his alleged exclusive control.

## II

While we have concluded defendant lacked standing to challenge the search of the outbuildings, we also conclude that, regardless of defendant's standing, the search was sanctioned by Mrs. Washington's valid consent as co-occupant of the home. We note at the outset that the court found Mrs. Washington consented to the search of her "premises, including the curtilage thereof." Although the outbuildings were outside the curtilage, we nevertheless agree with the court that the scope of Mrs. Washington's consent to search included the outbuildings.

## A

**[3]** Even if we assume defendant's legitimate privacy interest in the outbuildings by virtue of his possession or control to the exclusion of third parties, we still reject defendant's argument that he had such "exclusive" control over the outbuildings that his co-occupant mother was not empowered to consent to their search. Since Mrs. Washington testified she never went into the packhouse or tobacco barn, defendant contends she had "relinquished" her control of those buildings to him. Rather than revealing defendant's acquisition of "exclusive" control over the outbuildings, the record instead discloses that defendant and his mother shared joint access to, if not control of, the outbuildings. Mrs. Washington's subjective assessment was that "we all had control." Such circumstances reveal common authority to consent. In *U.S. v. Matlock*, 415 U.S. 164 (1974), the U. S. Supreme Court observed that:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third party consent does not rest upon the law of property, with its attendant historical and legal refinements [citations omitted] but rests rather on mutual use of the property by persons generally having *joint access or control for most purposes*, so that it is reasonable to recognize that *any of the cohabitants has the right to per-*

mit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n.7 (emphasis added).

There are thus two bases of "common authority" supporting the right of persons having joint access or control to consent under *Matlock*: (1) that the consenting party could permit the search "in his own right"; and (2) that the defendant had "assumed the risk" that a co-occupant might permit a search. 1 W. LaFave & J. Israel, Criminal Procedure Sec. 3.10(d) at 350 (1984). Mrs. Washington never relinquished her right of access or control in the outbuildings. Defendant cannot demonstrate his exclusive control of the premises simply by evidence that his mother did not actually use part of the leased premises: her actual use is irrelevant where she retained sufficient control over the premises that defendant assumed the risk that she might at some time exercise her right to enter upon and inspect the premises and permit others to do so. *United States v. Cook*, 530 F. 2d 145, 149 (7th Cir. 1976), *cert. denied*, 426 U.S. 909 (1976); *see also Frazier v. Cupp*, 394 U.S. 731, 740 (1969) (although only gave actual permission to use part of bag, defendant assumed risk other would allow search of whole bag). Since Mrs. Washington retained common authority over the outbuildings under *Matlock*, defendant by definition lacked such exclusive control that he alone could consent to any search.

The instant case is clearly distinguishable from those circumstances where items of personal property are brought into joint living situations without a defendant waiving his Fourth Amendment expectations in such property. *E.g.*, *United States v. Gilley*, 608 F. Supp. 1065, 1068 (D. Ga. 1985) (guests and co-residents may have privacy interests in articles such as travel bags which are not waived by a third-party consent search); *see also United States v. Block*, 590 F. 2d 535, 542 (4th Cir. 1978) (suitcases, footlockers and brief cases are objects of privacy; common authority does not automatically extend to interiors of every enclosed space capable of being searched within common area).

B

[4] Since defendant shares common authority with his mother, defendant next argues that under *Matlock* his mother could consent to a search only in his absence. Defendant notes that the

*Matlock* Court stated "the consent of one who possesses common authority over premises or effects is valid as against the *absent, non-consenting* person with whom that authority is shared." 415 U.S. at 170 (emphasis added). In the instant case, defendant was either inside the house or inside a patrol car outside the house throughout the incident. Defendant argues his mother's authority to consent could not override his own since he was not "absent."

However, the record reveals no instance where defendant either refused consent to the officers or communicated any refusal to his mother; thus, defendant, though present, was not "non-consenting" under *Matlock*. Similarly, in *State v. McNeill*, 33 N.C. App. 317, 319, 235 S.E. 2d 274, 275 (1977), we upheld a lessee's consent to search despite the fact the co-habitant defendant was present, though apparently non-objecting, throughout the search. We specifically held the lessee was authorized to give consent to a search under N.C.G.S. Sec. 15A-222(3), which states, "the consent . . . must be given . . . by a person who by ownership or otherwise is reasonably apparently entitled to give or withhold consent to a search of premises." *Id.* We have held Section 15A-222(3) is "consistent with the language in *Matlock* . . . that permission may be 'obtained from a third party who possessed *common authority or other sufficient relationship to the premises* or effects sought to be inspected.'" *State v. Kellam*, 48 N.C. App. 391, 397, 269 S.E. 2d 197, 200 (1980) (quoting *Matlock*, 415 U.S. at 171) (emphasis in original).

However, while we have held *either* occupant can consent to a search where two occupants have equal rights to the use or occupation of the premises, *e.g., State v. Carter*, 56 N.C. App. 435, 437, 289 S.E. 2d 46, 47, *disc. rev. denied*, 305 N.C. 761, 292 S.E. 2d 576 (1982), we have not yet addressed the precise issue of *which* occupant's consent controls if both occupants are present and one refuses consent. Since defendant did not object at the time of the search, the issue has not been properly raised under these facts; however, even if defendant had objected to the search, we question whether defendant's presence and objection would vitiate his mother's consent even under *Matlock*. His mother certainly retained "joint access and control" sufficient to enable her to consent "in her own right" to a search of the premises. Since Mrs. Washington could consent to the searches in her own right under

*Matlock*, we question how defendant's refusal could have invalidated her consent that did not depend on his authority in the first place. Furthermore, it can be argued defendant likewise assumed the risk under *Matlock* that his mother might not comply with his wishes. *See generally*, 1 W. LaFave & J. Israel, Criminal Procedure Sec. 3.10(d) at 350 (1984). For these reasons, we conclude there was no error in the court's conclusion that Mrs. Washington had sufficient authority to authorize a warrantless search of the outbuildings on her leased premises.

C

[5] Defendant asserts his mother's consent to search was invalid for the additional reason that it was the result of coercive statements by a sheriff's deputy. As our Supreme Court stated in *State v. Brown*, 306 N.C. 151, 170, 293 S.E. 2d 569, 582, *cert. denied*, 459 U.S. 1080 (1982):

> When the validity of a consent to search is challenged, the trial court must conduct a *voir dire* to determine whether the consent was in fact given voluntarily and without compulsion [citation omitted]. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 [1973] [citations omitted].

There was competent evidence introduced during the suppression hearing and subsequent trial supporting the trial court's conclusion that Mrs. Washington's consent was valid. A sheriff's deputy testified the coercive threat of arrest occurred after the consent searches of the Ford automobile and the outbuildings. Mrs. Washington testified that defendant's mother-in-law produced a stolen cooler from defendant's room immediately after hearing the coercive threat; this clearly occurred *after* the search outdoors. Furthermore, Mrs. Washington testified she was not intimidated by the deputy's threat and would have let the officers search in any event. Considering the totality of these circumstances, there was ample, competent evidence supporting the court's determination Mrs. Washington's consent to search the outbuildings and car was given voluntarily.

## III

**[6]**  Defendant next contends that the items taken from the 1971 Ford automobile should have been suppressed. The court found defendant's mother validly consented to a search of the vehicle under N.C.G.S. 15A-222(2) (1983) which provides, "the consent must be given . . . by the registered owner of a vehicle to be searched or by the person in apparent control of its operation and contents at the time the consent is given." Defendant's mother was the registered owner of the car. Defendant apparently contends that, as the "actual" owner/purchaser of the car, his consent was necessary as long as he was present. Defendant was clearly not the registered owner; nor was he "in apparent control of [the car's] operation and contents at the time the consent [was] given." Thus, defendant was not in either instance the proper party to consent to a search of the automobile under N.C.G.S. Sec. 15A-222(2). *Cf. State v. Jefferies*, 41 N.C. App. 95, 100, 254 S.E. 2d 550, 554, *further rev. denied*, 297 N.C. 614, 257 S.E. 2d 438 (1979) (driver of automobile was deemed in apparent control of the vehicle at time of search); *State v. McMillen*, 59 N.C. App. 396, 403, 297 S.E. 2d 164, 168 (1982) (driver deemed in possession and control); *see also State v. Faison*, 17 N.C. App. 200, 201-02, 193 S.E. 2d 334, 336, *cert. denied*, 283 N.C. 258, 195 S.E. 2d 690 (1973) (unregistered owner/passenger properly gave consent to search). Since Mrs. Washington's consent was valid under the statute, we conclude Judge Watts committed no error in denying defendant's motion to suppress the evidence obtained from the 1971 Ford automobile.

## IV

**[7]**  In his motion to dismiss, defendant argued the trial court should not have submitted the charge of felonious breaking or entering to the jury. Defendant contended he could have come into possession of the stolen property by some means other than breaking or entering.

A motion to dismiss requires that the trial court consider the evidence in the light most favorable to the State with every reasonable inference drawn from the evidence in the State's favor. *State v. McKinney*, 288 N.C. 113, 117, 215 S.E. 2d 578, 581-82 (1975). As long as there is substantial evidence, direct or circumstantial, to support finding the defendant committed the offense,

a case for the jury is made. *Id.* The State introduced photographs of automobile tire impressions appearing at the scene of the break-in. The State also offered evidence that the tread of the rear tires of defendant's automobile appeared to be the same as the tire impressions at the scene of the crime. An SBI expert testified the tires on defendant's automobile could have made the impressions at the scene.

Furthermore, the State argued the application of the doctrine of recent possession of stolen property was strong evidence of defendant's commission of the crimes of breaking or entering and larceny. Only nine days elapsed between the break-in and the night sheriff's deputies discovered many of the stolen items at defendant's residence. As stated in *State v. Lewis*, 281 N.C. 564, 568, 189 S.E. 2d 216, 219, *cert. denied*, 409 U.S. 1046 (1972):

> When it is established that a store or warehouse has been broken into and entered and that merchandise has been stolen therefrom, the discovery, soon after such theft of articles, so stolen, in the possession of the defendant raises a presumption that *he is guilty both of the breaking and entering and of the larceny.* [Emphasis added.]

The State's evidence must establish the following facts in order to invoke the doctrine of recent possession: (1) the goods were stolen; (2) the goods were in defendant's custody and control to the exclusion of others; and (3) defendant possessed the property recently after the larceny. *State v. Maines*, 301 N.C. 669, 674, 273 S.E. 2d 289, 293 (1981). Defendant only challenges the State's proof of the last requirement.

In *State v. Jackson*, 274 N.C. 594, 597, 164 S.E. 2d 369, 370 (1968), our Supreme Court stated:

> Evidence or inference of guilt arising from the unexplained possession of recently stolen property is strong, weak, or fades out entirely, on the basis of the time interval between the theft and possession . . . . The possession, in point of time, should be so close to the theft as to render it unlikely that the possessor could have acquired the property honestly. [Citations omitted.]

In *State v. Callahan*, 83 N.C. App. 323, 326, 350 S.E. 2d 128, 130, *disc. rev. denied*, 319 N.C. 225, 353 S.E. 2d 409 (1987), we stated

the significance of the time elapsed between the larceny and the time of possession depends on the facts and circumstances of each case. We also noted the inference of defendant's guilt survives longer where the items stolen are not of a type normally or frequently traded in lawful channels. In such cases, it is more likely the defendant acquired the property by his own acts to the exclusion of any intervening agency. We therefore held in *Callahan* that the doctrine of recent possession was applicable where ten to eleven days had elapsed after the theft of commercial restaurant equipment. *Id. See also State v. Blackmon*, 6 N.C. App. 66, 77, 169 S.E. 2d 472, 479 (1969) (doctrine applicable where 27 days elapsed after theft of unique hand-made and rarely used mechanic's tool); *cf. State v. Hamlet*, 316 N.C. 41, 45, 340 S.E. 2d 418, 421 (1986) (doctrine rejected where 30 days elapsed after theft of television, towels and fan).

In the instant case, a large number of the stolen tools were painted red or yellow by the W. A. Gaskins Company and etched with the identifying initial "G." We have already noted the vending machine metal work which was found by the tobacco barn. Such unique tools and metal work are not of a type normally found or traded in lawful channels; therefore, we believe the lapse of nine days does not defeat the inference of defendant's guilt arising from his possession of recently stolen property. While not all of the stolen property was recovered, defendant's possession of part of the property under these circumstances warrants the inference that defendant stole all of it. *State v. Boomer*, 33 N.C. App. 324, 328, 235 S.E. 2d 284, 287, *cert. denied*, 293 N.C. 254, 237 S.E. 2d 536 (1977).

In light of defendant's recent possession of the stolen items as well as evidence of tire impressions connecting him to the breaking or entering and larceny, we hold the motion to dismiss the State's charge of breaking or entering was properly denied. The test is not whether the evidence is circumstantial, but whether it is substantial. *McKinney*, 288 N.C. at 117, 215 S.E. 2d at 582. Taken as a whole, the State's evidence was substantial.

## V

[8] Finally, defendant argues the trial court did not separately "consider" the aggravating and mitigating sentencing factors as to each of defendant's convictions. Specifically, the transcript of

defendant's sentencing hearing reveals the trial court heard evidence of aggravating sentencing factors, then heard defendant's presentation of certain non-statutory mitigating evidence. The court then found the aggravating factors outweighed the mitigating factors and separately listed the factors for each conviction.

Defendant asserts this procedure does not comport with our Supreme Court's holding in *State v. Ahearn*, 307 N.C. 584, 598, 300 S.E. 2d 689, 698 (1983):

> Separate findings as to the aggravating and mitigating factors for each offense will facilitate appellate review. Further, in the interest of judicial economy, separate treatment of offenses, even those consolidated for hearing, will offer our appellate courts the option of affirming judgment for one offense while remanding for resentencing the offense in which error is found. . . . We therefore hold that in every case in which the sentencing judge is required to make findings in aggravation and mitigation to support a sentence which varies from the presumptive term, each offense, whether consolidated for hearing or not, must be treated separately, and separately supported by findings tailored to the individual offense and applicable only to that offense.

In *Ahearn*, defendant was found guilty of felonious child abuse and manslaughter. In imposing sentences on each count greater than the presumptive sentence, the trial judge completed only one sentencing form, "thus treating both offenses alike for purposes of listing the findings in aggravation and mitigation." *Id.* at 592, 300 S.E. 2d at 694. Conversely, the trial court in the instant case held one sentencing hearing but completed two sentencing forms entitled "Felony Judgment—Findings of Factors in Aggravation and Mitigation of Punishment." Thus, unlike *Ahearn*, it cannot be said the court here "treat[ed] both offenses alike for purposes of listing the findings in aggravation and mitigation."

Defendant concedes the trial court's written findings meet part of the *Ahearn* standard, but argues the transcript of the sentencing hearing does not reveal the offenses and sentencing factors were themselves "considered" separately. In *State v. Avery*, 315 N.C. 1, 337 S.E. 2d 786 (1985), defendant argued the trial court "mechanically recited" the same aggravating factors

for each conviction without giving "consideration" to the specific offenses being punished. The Supreme Court found no error, stating simply, "the record reveals the trial court made a separate finding for each crime in accordance with the rule stated in [*Ahearn*]." *Id.* at 34, 337 S.E. 2d at 805. Under *Ahearn* and *Avery*, we likewise find no error in the trial court's sentencing.

## VI

Having found defendant's assignments of error without merit, we conclude there is

No error.

Judges WELLS and EAGLES concur.